997 A.2d 163 (2010)
202 N.J. 232
STATE of New Jersey, Plaintiff-Respondent,
v.
P.S., Defendant-Appellant.
A-21 September Term 2009.
Supreme Court of New Jersey.
Argued February 1, 2010.
Decided June 7, 2010.
*167 Alison S. Perrone, Designated Counsel, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney).
Jeanne Screen, Deputy Attorney General, argued the cause for respondent (Paula T. Dow, Attorney General, attorney); Ms. Screen and Marisa Slaten, Deputy Attorney General, on the brief.
Justice LONG delivered the opinion of the Court.
In this appeal we address several recurring issues in criminal law. The first is what standard to apply where a child sex abuse victim's taped statement is lost. In particular, defendant asks us to establish a per se rule of exclusion in such circumstances, a request that we decline. Instead we reaffirm the totality of circumstances standard as the appropriate benchmark for the admissibility of a tender years statement under N.J.R.E. 803(c)(27). In addition, we reiterate our holdings in State v. Cook, 179 N.J. 533, 847 A.2d 530 (2004), and State v. Branch, 182 N.J. 338, 865 A.2d 673 (2005), to the effect that simultaneous notes taken of a child sex abuse victim's interview should not be destroyed but should be maintained through trial.
The second issue centers on the proper use of other-crimes evidence under N.J.R.E. 404(b). Like the Appellate Division, we conclude that a defendant's invocation of the so-called vendetta defense does not permit the prosecutor to bolster the credibility of a sex abuse victim by adducing evidence of another molestation. To be sure, such evidence could be offered to negate accident; to establish motive, pattern, or design; or for a myriad of other legitimate reasons under the rule. What is interdicted is its admission to show that because the defendant committed a bad act before, he is likely to have committed one again, thus making the victim's story more believable.

I.
Defendant Peter Scott was indicted in the Superior Court of Passaic County for first-degree aggravated sexual assault, contrary to N.J.S.A. 2C:14-2(a)(1) (Count One); second-degree sexual assault, contrary to N.J.S.A. 2C:14-2(b) (Count Two); and second-degree endangering the welfare of a child, contrary to N.J.S.A. *168 2C:24-4(a) (Count Three), all allegedly perpetrated on his stepdaughter, Katie Jones.[1]
Prior to trial, a preliminary hearing pursuant to N.J.R.E. 104(a) was held to determine whether Giselle Henriquez, a child interview specialist with the Passaic County Prosecutor's Office, could testify regarding statements made to her by Katie. At the hearing, Henriquez, who interviewed Katie on April 24, 2003, described Katie's statements to her as follows:
[Katie] referenced an incident where [defendant] put a pillow over her head. She was laying on the bed. He turned her over. He  these again were his  her words. And he put a pillow over her head because she was trying to call her brother or something to that degree.
. . . .
She was very specific in saying he turned her  she was on her back, to  so, she  he turned her onto her stomach.
He put his private, which she referred to as his private in her butt.
[The second time] was pretty much the same. Him putting his private in her butt.
He pulled  he pulled it out and yellow stuff came out ... either he urinated or ejaculated.
On the third incident, I think that was the one that she describes where he not only put his private in her butt but also in her front part, I think she uses  she refers to her vagina? ... [a]nd put his private into her  into her front part.
Henriquez testified that she had extensive experience interviewing child sex abuse victims and had been well-trained in interview techniques. According to Henriquez, she "stressed the importance of telling the truth," and Katie agreed to do so. Henriquez testified that she did not promise Katie anything during the interview, that she never suggested any answers to her, and that Katie was the one who first brought up defendant's name.
The judge held that Katie's statements to Henriquez were admissible under the tender years exception to the hearsay rule, N.J.R.E. 803(c)(27). In ruling, the judge found that the interview was not suggestive and that there was a probability that the statements were trustworthy.
The State then moved, pre-trial, pursuant to N.J.R.E. 404(b), to adduce evidence of defendant's "other crime," namely, an allegation that defendant had sexually abused a three-year-old boy, I.B., in 1997, while defendant was a resident at a halfway house.
An evidentiary hearing was held at which I.B.'s mother testified that she left I.B., then three years old, to play on the porch of the halfway house unsupervised, and that defendant was on the porch with him. She further testified that after they left the halfway house, I.B. told her that defendant had touched him. Pointing to places on his body, the mother determined that defendant had touched I.B. on his buttocks and rectum. Charles H. Parks, a supervisor at the halfway house, testified that he had told I.B.'s mother on March 24, 2007, and on previous visits, not to let I.B. out of her sight; she had ignored his requests. Parks also testified that defendant and I.B. were alone on the porch, and that he heard defendant tell I.B. to hold the back of his pants. Parks explained that in prison culture, that meant that I.B. was defendant's "woman." Finally, Dr. Mary Grace Ponce testified that she had examined I.B. on March 24, 1997, and that I.B. had told her that defendant put medicine or cream in I.B.'s behind. When Dr. *169 Ponce examined I.B.'s rectum, I.B. said, "[defendant] did that." Dr. Ponce noted two superficial fissures, or cuts, in I.B.'s rectal area, and said that the fissures could "be caused by constipation but [that she could not] entirely rule out fondling or sexual abuse."
The judge found that the other-crimes evidence satisfied the four-factor test articulated in State v. Cofield, 127 N.J. 328, 338, 605 A.2d 230 (1992): the evidence was relevant because the credibility of the victim would likely be placed at issue; the other crime was "similar in kind" and "reasonably close in time" as both I.B. and Katie were child victims; evidence of the other crime was clear and convincing; and the probative value would not be outweighed by the prejudicial effect of the evidence because the judge would give the jury a limiting instruction. Thus, the judge held that evidence of defendant's sexual assault of I.B. would be admissible to bolster the credibility of Katie and to rebut claims of bias, but only after cross-examination, if defense counsel challenged the credibility of Katie and her mother by placing their bias in issue.
The State also made a motion in limine to preclude defendant from mentioning that Katie's uncles assaulted and blinded him on June 3, 2003, after Katie's allegations surfaced. Defense counsel represented that the uncles were convicted of attempted murder for the assault and argued not only that Katie's mother, Ursula Jones,[2] may have influenced Katie to fabricate her allegations to get defendant out of the house, but also that Ursula became more invested in the case against defendant after her brothers were sentenced to "15 and 12 years" in prison. The judge rejected defendant's arguments and granted the State's motion, ruling that defendant could not bring up the 2003 assault.
At trial, Katie testified that she was "raped three times" by her stepfather on three separate occasions, all of which occurred when she was nine or ten years old. She described one incident wherein he "pushed [her] and then turned [her] over onto [her] stomach," and then "put his private part in [her] butt"; a second incident wherein he "pushed [her] back on the bed and put his private in [her] butt" and "something  yellow stuff came out"; and a third incident wherein he "came in [her] room and he put his private in [her] front and in [her] back." Katie further testified that on April 24, 2003, she went to her grandmother's house after school. Katie told her grandmother that her "private was hurting," because she "felt like that was [her] way to tell" her grandmother about the abuse.
Ursula testified that when she picked Katie and her brother up from their grandmother's house that day, the grandmother informed Ursula that Katie's "bottom was hurting" and that Katie had something to tell Ursula. After bringing Katie home, Ursula asked her what happened and if someone had touched her. Katie said that it was defendant who touched her. At that point, Ursula brought Katie to the hospital to be examined. Katie testified that when she returned home from the hospital, her stepfather whispered to her, "lie so we can be a family."
During trial, defendant sought to introduce evidence that Katie had disclosed prior sexual activity when she went to the hospital with her mother. The evidence consisted of a notation in the hospital record reading: "11 year old female [] burning sensation when she urinate [sic] and also frequency of urination had sex 3 *170 months ago one time [] vaginal discharge." Defense counsel argued that the introduction of the report was necessary for three reasons: to explain Katie's mother's statement that she had looked at Katie's vaginal opening and that it "looked bigger than... a normal child's at that time"; because it shed light on Katie's credibility and the consistency of the story she told; and to explain how a twelve-year-old girl would know about ejaculation. The State argued that that evidence was barred by the Rape Shield Law, N.J.S.A. 2C:14-7.
The trial judge ruled that that evidence was inadmissible. In particular he noted that there was no suggestion in the notation that ejaculation was involved in the prior incident, that the evidence was "too speculative," and that its "probative value... [was] not there." The trial judge also noted that Katie "didn't use any age inappropriate language that she may [not] have gotten from some other place to describe this."
According to the testimony at trial, after leaving the hospital, Ursula and Katie reported the incident to the police, who took them to see Henriquez. Henriquez testified that, in interviewing Katie, she followed a specific protocol known as "Finding Words," which is designed to gather information from a young child in a short period of time while avoiding intimidating or suggesting responses to the child. First she built a rapport with Katie; then she inquired as to the terms Katie used to refer to different parts of the male and female anatomy. Next, she questioned Katie as to what Katie considered to be "positive and negative touches." Katie volunteered that her stepfather sometimes touched her in a way she did not like, describing several incidents of sexual abuse. Henriquez recounted those statements as follows:
[Katie] told me about a time where she was lying down and her stepfather came into the room and turned her over. She was lying on a bed. He turned her over, put a pillow over her head, and put his private in her private  or in her butt.
. . . .
[Katie] talked about another time where he only had underwear on and he pulled his penis out of the front hole of the underwear and put  I'm sorry  put his private in her butt and her vagina  her private  her private ... And she said-she describes something coming  stuff coming out of his private.
. . . .
[S]he described what can be assumed is ejaculation.
. . . .
[Katie] told me about another incident that occurred in her Mom's bedroom. Her Mom had-she said she was sleeping in bed with her Mom. Her Mom had gotten up to go to work. And she heard steps. She heard someone walking. Her Mom had already left for work. Her stepfather came into the bedroom, took-taken off his clothes, and gotten into bed with her. And she specifically said she was holding onto a pillow and he rolled her over, put his private in her  in her private and in her butt.
Henriquez further testified that she had intended to videotape the interview, and believed that the interview was being recorded; however, after the interview, she discovered that the video equipment had failed. To avoid traumatizing Katie, Henriquez declined to re-interview her; instead, she immediately made notes of everything she recalled of her questions and Katie's responses. Those notes formed the basis for a report that Henriquez wrote and submitted to her supervisor. The report was filed on June 26, 2003, approximately two months after the interview, *171 and Henriquez's notes were discarded.
Defendant originally intended to present a vendetta defense to the jury by demonstrating that Katie, with Ursula's help, fabricated her allegations in order to get defendant out of the house. At trial, defense counsel elicited testimony from Ursula confirming that, in 1999, Ursula hit Katie and the authorities became involved. The judge allowed the question under the theory that because Katie was afraid of her mother, Ursula would be able to coerce Katie into lying about the sexual abuse. Katie confirmed on cross-examination that her mother had hit her before, and that she was afraid that her mother would hit her if she told her about the abuse.
Defense counsel also questioned Ursula regarding her statement to a Prosecutor's Office investigator that her "marriage was a mess." In his summation, defense counsel alluded to some minor inconsistencies in Katie's, Ursula's, and Henriquez's testimony, and argued that Ursula did not behave the way a reasonable mother would in response to allegations of sexual abuse against her daughter. However, presumably to avoid opening the door to the admission of evidence of defendant's prior alleged assault of I.B., defense counsel declined to attack the credibility of either witness directly and did not overtly suggest the vendetta theory. Instead, he said the following:
Now, I know what's in everyone's questions  questions in everyone's mind and I'm sure the [p]rosecutor is going to want to come up and say this is why would [Katie] say something like this? That's on everybody's mind. Why would she say this? And the [p]rosecutor  she's going to say she said this because it happened.
And my job, and it's not my job or my burden or responsibility to tell you why [Katie] did this. You have to understand something here. The State has the burden to prove this. The evidence that you were shown, a lot of things can be deduced from what happened.
[Katie], through her testimony, asked if she was scared of her mother. She said, yes, I'm scared of my mother. She said her mother hits her. I asked her if she ever got hit by her and she said yes.
Her mother, [Ursula], testified there were times that she did beat her  her daughter. And she said even on direct  direct examination she would beat her if she didn't tell her what happened when she asked her in reference to why her private was hurting. She said it pretty vigorously. She admitted in cross-examination that she hit her so bad at one point that the authorities had to be called.
The child here  it seems that she's petrified of her mother and she had a right to because she had-had hit her at one point and the authorities had to come.
On direct examination, when the [p]rosecutor asked [Ursula] about the relationship between her and [Peter], she said it was a mess. She said it wasn't good. Here's an impressionable young girl who's scared of her mother.
The jury convicted defendant on all counts. On the sexual assaults, he was sentenced to a custodial term of twenty years with ten years of parole ineligibility. A consecutive sentence of ten years with five years of parole ineligibility was imposed on the endangering count.
Defendant appealed, raising a series of arguments, including that Katie's statements to Henriquez were inadmissible because there was no videotape; that the statements were not sufficiently reliable; *172 that the other-crimes evidence was improperly ruled admissible; and that the Rape Shield Law did not bar the evidence he offered regarding Katie's alleged prior sexual experience. He also challenged his sentence.
The Appellate Division affirmed defendant's conviction on all counts, and his sentence on Counts One and Two. The panel remanded defendant's sentence on Count Three because of its consecutive nature, which the panel held violative of State v. Yarbough, 100 N.J. 627, 498 A.2d 1239 (1985), cert. denied, 475 U.S. 1014, 106 S.Ct. 1193, 89 L.Ed.2d 308 (1986), superseded by statute, N.J.S.A. 2C:44-5. The panel rejected defendants' remaining arguments. Although it agreed with defendant that the N.J.R.E. 404(b) evidence was inadmissible, the panel ruled that because the evidence was not, in fact, admitted, any error by the court was harmless.
Defendant filed a petition for certification, which we granted. 200 N.J. 369, 982 A.2d 457 (2009).

II.
Defendant argues that Katie's out-of-court statements to Henriquez were improperly admitted because the interview was not electronically recorded and asks this Court to adopt a per se rule barring the admission of such statements. Defendant further contends that Katie's statements to Henriquez were not sufficiently reliable because Henriquez had a "preconceived notion of what had supposedly happened." Regarding the other-crimes evidence, defendant maintains that the judge's ruling deprived him of a fair trial even though the evidence was never admitted. Finally, defendant argues that the judge's barring of the evidence of Katie's prior sexual experience deprived him of his rights under the Confrontation Clause, U.S. Const. amend. VI.
The State maintains that the trial court's factual findings regarding Katie's interview were supported by sufficient credible evidence and that Katie's statements were properly deemed reliable. Noting this Court's prior rejection of a per se rule barring unrecorded statements, the State objects to defendant's proposal that the Court adopt such a rule. The State further argues that the trial court correctly ruled on the other-crimes evidence, and that regardless, any error was harmless because the evidence was not actually admitted. Finally, the State argues that the Rape Shield Law precludes evidence of the victim's previous sexual conduct and that, in any event, defendant did not have sufficient evidence of Katie's alleged prior sex acts, even if they were relevant.

III.
The tender years exception to the hearsay rule, which allows the out-of-court statement of a child sexual abuse victim to be admitted into evidence, provides:
A statement by a child under the age of 12 relating to sexual misconduct committed with or against that child is admissible in a criminal, juvenile, or civil proceeding if (a) the proponent of the statement makes known to the adverse party an intention to offer the statement...; (b) the court finds, in a hearing conducted pursuant to Rule 104(a), that on the basis of the time, content and circumstances of the statement there is a probability that the statement is trustworthy; and (c) either (i) the child testifies at the proceeding, or (ii) the child is unavailable as a witness and there is offered admissible evidence corroborating the act of sexual abuse. ...
[N.J.R.E. 803(c)(27).]
The rule was this Court's response to the proof problems that inhere in the prosecution *173 of child sex abuse  in particular, the absence of witnesses and physical evidence, the ambivalence of the victim about discussing sexual matters, and the victim's fear of naming a close friend or relative. State v. D.R., 109 N.J. 348, 358-60, 537 A.2d 667 (1988). Although we recognized in D.R. that a spontaneous out-of-court statement by a child can be "highly credible," we were also concerned with the defendant's need for confrontation and particularly for cross-examination. Id. at 359, 369, 537 A.2d 667. Thus, sufficient indicia of reliability or trustworthiness became the focus of the rule, originally Evid. R. 63(33), in order to avoid Confrontation Clause conflicts. Idaho v. Wright, 497 U.S. 805, 822, 110 S.Ct. 3139, 3150, 111 L.Ed.2d 638, 657 (1990).
N.J.R.E. 803(c)(27) requires the trial judge to conduct a preliminary hearing pursuant to N.J.R.E. 104(a) to determine whether an out-of-court statement is sufficiently reliable, based on the "time, content and circumstances of the statement" and then decide what is the "probability that the statement is trustworthy." State v. D.G., 157 N.J. 112, 128, 723 A.2d 588 (1999). In determining whether the statement satisfies that standard, the judge should consider "the totality of the circumstances." State v. Roman, 248 N.J.Super. 144, 152, 590 A.2d 686 (App.Div.1991).
In Idaho v. Wright, the United States Supreme Court summarized a non-exclusive list of factors relevant to evaluating the reliability of out-of-court statements made by child victims of sexual abuse, including spontaneity, consistent repetition, mental state of the declarant, use of terminology unexpected of a child of similar age, and lack of motive to fabricate. Wright, supra, 497 U.S. at 821-22, 110 S.Ct. at 3150, 111 L.Ed.2d at 656 (citations omitted).
Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), "has entirely changed the Confrontation Clause landscape, rendering `defunct' the reliability test set out in Wright." State v. Burr, 392 N.J.Super. 538, 569-70, 921 A.2d 1135 (App.Div.2007), aff'd and modified, 195 N.J. 119, 948 A.2d 627 (2008). Under the new rule, admissibility of a child victim's statement is conditioned upon the State's prior notice of its intention to introduce the child's statement, "a pre-trial judicial finding of trustworthiness, and [an] opportunity to cross-examine the child at trial[.]" State v. R.B., 183 N.J. 308, 318, 873 A.2d 511 (2005). Nonetheless, there remains a "need for a trustworthiness analysis ... under N.J.R.E. 803(c)(27), and the same factors identified in Wright, and endorsed by D.G., are appropriate for guidance in that context." Burr, supra, 392 N.J.Super. at 570, 921 A.2d 1135 (citations omitted).
Further, in State v. Michaels, 136 N.J. 299, 642 A.2d 1372 (1994), we outlined factors to determine whether an interview technique has the requisite indicia of reliability. Relevant to the analysis are details such as "lack of investigatory independence, the pursuit by the interviewer of a preconceived notion of what happened to the child, the use of leading questions, and a lack of control for outside influences on the child's statements[.]" Id. at 309, 642 A.2d 1372. The analysis is flexible and does not require a mechanical approach. D.G., supra, 157 N.J. at 125, 723 A.2d 588. In Michaels, we also underscored the importance of videotaping child interviews and held that such videotapes should be considered in any trustworthiness analysis. Michaels, supra, 136 N.J. at 313-14 n. 1, 642 A.2d 1372.
Regarding admissibility under N.J.R.E. 803(c)(27), the judge's factual findings are entitled to deference by a *174 reviewing court. State v. Robinson, 200 N.J. 1, 15, 974 A.2d 1057 (2009); State v. Locurto, 157 N.J. 463, 474, 724 A.2d 234 (1999); State v. Johnson, 42 N.J. 146, 160-61, 199 A.2d 809 (1964). "[A]n appellate court reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are `supported by sufficient credible evidence in the record.'" State v. Elders, 192 N.J. 224, 243, 927 A.2d 1250 (2007) (citations omitted).
Specifically, in reviewing a trial judge's finding that a child's statement meets the trustworthiness requirement of N.J.R.E. 803(c)(27), appellate courts affirm unless the judge's determination amounted to an abuse of discretion. State v. Nyhammer, 197 N.J. 383, 411, 963 A.2d 316, cert. denied, ___ U.S. ___, 130 S.Ct. 65, 175 L.Ed.2d 48 (2009). A trial court's determination of reliability or trustworthiness sufficient to allow admission of evidence should not be disturbed unless, after considering the record and giving the deference owed to the court's credibility findings, it is apparent that the finding is "clearly a mistaken one and so plainly unwarranted that the interests of justice demand intervention and correction[.]" Locurto, supra, 157 N.J. at 471, 724 A.2d 234 (internal quotation marks and citations omitted). Only in those circumstances may "an appellate court `appraise the record as if it were deciding the matter at inception and make its own findings and conclusions.'" Elders, supra, 192 N.J. at 244, 927 A.2d 1250 (quoting Johnson, supra, 42 N.J. at 162, 199 A.2d 809).
In respect of the admissibility of Henriquez's trial testimony, the trial judge concluded:
The Court has heard testimony from Ms. Giselle Henriquez. She's a Child Interview Specialist. Her job is to interview children under the age of 12 who were allegedly sexually abused.
She said she's conducted approximately 600 to 700 of these interviews and she  they use  she, in conjunction with the Passaic County Prosecutor's Office, uses a technique known as the Corner House Forensic Interview Approach. These interviews are conducted at a Child Advocacy Center. ...
. . . .
The process of the  interview was explained to the mother and then Ms. Henriquez took the alleged child victim to the interview room. She and the young child were the only ones in the interview room. She told the child to tell the truth and did not  gave the child the admonition that the child did nothing wrong and she shouldn't feel in any way that she was creating a problem for others.
She reviewed the anatomy with the child. The child used age-appropriate language. And then when she, when describing body parts she then on both males and females she then talked about good hugs and bad hugs. She knew the difference between good hugs and bad hugs and she said that allegedly the defendant in this case gave her bad hugs which is something that she did not like, a touching that she did not like.
. . . .
These interviews are normally video taped but the video tape malfunctioned. There's no requirement under the law that they be video taped. And there was a reasonable reason given for not re-interviewing the child  to re-traumatize the child. The child was able to provide a  a clear account of what she says happened.
Now, a report was prepared by Ms. Henriquez and this was done based on notes that she had taken. When that *175 final report was-perhaps it was two months before the final report was issued because others had to review it.
There's no suggestion in this case with this child. There's nothing  the child was not spoken to in front of her mother. There's no evidence that the mother influenced the child at all. The child, according to Ms. Henriquez, who I find to be credible and competent and capable in these types of issues, acted appropriately, discussed the matter appropriately.
And I'm going to permit the ... statement of the child. ... I'm satisfied that the reliability is trustworthy.
On appeal, the Appellate Division stated:
The judge had the opportunity to observe and assess the credibility of Henriquez, who testified fully and was subject to extensive cross-examination. The judge applied appropriate reliability factors under the totality of circumstances test. See ... Michaels, [supra,] 136 N.J. ... [at] 306[, 642 A.2d 1372]. ... These factors include, for example, whether the child's statement was made spontaneously without prompting, whether the account was repeated with consistency, the mental state of the declarant, lack of motive to fabricate, use of age-appropriate terminology, interrogation, and potential manipulation by adults. See ... D.G., [supra,] 157 N.J. ... [at] 125[, 723 A.2d 588]. ... The judge's credibility assessment and finding of trustworthiness is well supported by the evidence presented at the Rule 104(a) hearing, and we defer to that finding. ... Locurto, [supra,] 157 N.J. ... [at] 474[, 724 A.2d 234]. ...
We have carefully reviewed this record and, like the Appellate Division, have determined that the trial judge's conclusions are fully supported by the evidence and legally unassailable.
We turn then to defendant's claim that we should establish a per se rule that in the absence of a tape recording, a child victim's statement should be deemed inadmissible under N.J.R.E. 803(c)(27). Of that contention, the Appellate Division stated:
We can dispose of defendant's argument urging a per se rule of exclusion quite summarily. Defendant acknowledges that no State or federal court has adopted such a rule. Further, defendant did not raise this issue in the trial court, and it is not properly before us. Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234[, 300 A.2d 142] (1973). We nevertheless address the issue substantively.
In Michaels, the Court identified video taping as a "sound interviewing methodology," endorsed by "nearly all experts," which courts should consider in determining trustworthiness. Michaels, supra, 136 N.J. at 313-14 n. 1[, 642 A.2d 1372.] The [C]ourt did not impose a recording requirement or even afford that procedure more weight than other desirable interviewing procedures and techniques. See id. at 312-15[, 642 A.2d 1372.] Further, the Court stated, "We have recognized generally that the existence of a video or sound recording of a statement elicited through pretrial interrogation is a factor bearing on its reliability." Id. at 314 n. 1[, 642 A.2d 1372] (citing State v. Gross, 121 N.J. 1, 10[, 577 A.2d 806] ... (1990)). It is thus clear that the presence or absence of electronic recording is only one factor in the totality of the circumstances that determines the admissibility of a tender years statement. There is no basis for adoption of a per se rule of exclusion.
*176 Again we are in agreement with the Appellate Division's conclusions.
We have no doubt, nor did we in Michaels, of the benefits of tape recording the statements of child sex abuse victims. Indeed, the videotape "convey[s] not only the exact words spoken by the child, but their finer shades of meaning through facial expressions, body movements and inflections of voice." State v. Donegan, 265 N.J.Super. 180, 185-86, 625 A.2d 1147 (App.Div.1993). In addition, a video recording creates an objective, reviewable record, enhances the reliability of confessions, protects police officers from false allegations, improves the overall quality of police work, and may well "preserve judicial resources" by discouraging defendants from raising frivolous pre-trial challenges to the admission of the child's statement. Cook, supra, 179 N.J. at 551-62, 847 A.2d 530. If no video equipment is available, some of the same purposes, though not all, can be served by audio recording.
As we understand it, prosecutors across the state have voluntarily undertaken to tape record the statements of child sex abuse victims for all of those stated reasons. Thus it would be redundant for us to order them to do so. We presume that they will continue such recording because it is a factor in the totality of circumstances analysis that determines the admissibility of a tender-years statement.
In this case, we are asked to consider the effect of tape machine malfunction. Because the tape is only one factor in the totality of circumstances analysis we established regarding trustworthiness, it follows that the absence of a tape, standing alone, is not dispositive. It is to be considered along with all the other factors we have previously set forth in Michaels and D.G. as relevant to trustworthiness.
What is important, however, as we indicated in Cook, is that simultaneous notes of an interview should not be destroyed but should be maintained through trial for use in a case in which the tape is lost or, for some reason, unusable. We reiterated that principle in Branch:
We register our displeasure that police officers engage in the seemingly routine practice of destroying their contemporaneous notes of witness interviews after the preparation of formal reports. ... We expressed our disapproval of the practice of destroying contemporaneous notes in ... Cook, [supra,] 179 N.J. [at] 542 n. 3[, 847 A.2d 530] ..., and do so again here.
[Branch, supra, 182 N.J. at 367 n. 10, 865 A.2d 673.][3]
Obviously, such notes will be invaluable in assessing the circumstances of the victims' statements and in establishing the substance thereof. See Michaels, supra, 136 N.J. at 321, 642 A.2d 1372 (noting interviewer's "failure to videotape or otherwise document the initial interview sessions" as factor weighing against trustworthiness (emphasis added)).
Here, the investigator took notes during the interview and used those notes to prepare a full report of the interview two months later. She testified that the material in her report reflected the contemporaneous notes, and the judge believed her, thus concluding that even in the absence of the tape or the contemporaneous notes, there was enough evidence to find that Katie's out-of-court statement was trustworthy. That is all that is required.

IV.
We turn next to defendant's claim that the trial judge improperly ruled *177 regarding the admissibility of other-crimes evidence in this trial. N.J.R.E. 404(b) governs other crimes, wrongs, or acts evidence:
Except as otherwise provided by Rule 608(b), evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.
[N.J.R.E. 404(b).]
Under the rule,
[t]he evidence must be offered for a proper purpose, must be relevant, must have probative value that is not substantially outweighed by the danger of unfair prejudice to the defendant, and must be coupled with a limiting instruction. A proper application of those rules balances the State's interest in presenting the evidence of "other crimes or wrongs" against the possibility of unfair prejudice to the defendant.
. . . .
The limited purposes for which other-crime evidence may be admitted include, but are not limited to, "establishment of a common scheme or plan, a signature crime, motive, and most frequently, to impeach the accused who takes the witness stand, but only through a conviction."...
The underlying danger of admitting other-crime evidence is that the jury may convict the defendant because he is "a `bad' person in general." ... Hence, even if the other-crime evidence is relevant to prove some legitimate trial issue, the trial court must still exclude it unless, under Evidence Rule [104], its probative value outweighs its prejudicial impact....
[Cofield, supra, 127 N.J. at 334, 336, 605 A.2d 230 (citations omitted).]
Because N.J.R.E. 404(b) is a rule of exclusion rather than a rule of inclusion, the proponent of other-crimes evidence must satisfy a four-part test:
1. The evidence of the other crime must be admissible as relevant to a material issue;
2. It must be similar in kind and reasonably close in time to the offense charged;
3. The evidence of the other crime must be clear and convincing; and
4. The probative value of the evidence must not be outweighed by its apparent prejudice.
[Id. at 338, 605 A.2d 230 (citation omitted).][4]
It is the relevance prong that is the focus in this case. Relevance means "having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. Consequently, to be relevant, the other-crimes evidence must bear on a subject that is at issue at the trial, for example, an element of the offense or some other factor such as motive, opportunity, intent, or plan. State v. Brown, 138 N.J. 481, 533, 651 A.2d 19 (1994), overruled on *178 other grounds, State v. Cooper, 151 N.J. 326, 377, 700 A.2d 306 (1997). In determining whether 404(b) evidence bears on a material issue, the Court should consider whether the matter was projected by the defense as arguable before trial, raised by the defense at trial, or was one that the defense refused to concede. State v. Stevens, 115 N.J. 289, 301-02, 558 A.2d 833 (1989). Further, the other-crimes evidence must be necessary for the proof of the disputed element. State v. Marrero, 148 N.J. 469, 482, 691 A.2d 293 (1997) (citing Stevens, supra, 115 N.J. at 301, 558 A.2d 833). Indeed, in assessing the fourth prong, courts should consider whether the matter can be proved adequately by other evidence. Stevens, supra, 115 N.J. at 303, 558 A.2d 833.
Importantly, other-crimes evidence should not be admitted solely to bolster the credibility of a witness against a defendant. State v. Darby, 174 N.J. 509, 520, 809 A.2d 138 (2002). "If other-crime evidence is admissible merely to support the credibility of a witness, then the Cofield standard designed to severely limit the use of such highly inflammatory evidence becomes meaningless." Id. at 521, 809 A.2d 138. See also Stevens, supra, 115 N.J. at 306, 558 A.2d 833 (holding other-crimes evidence not admissible as basis for inference that victim's version of events is true).
Two cases relied upon by the trial judge in declaring the other-crimes evidence admissible in this case are instructive. In State v. G.S., 145 N.J. 460, 469, 678 A.2d 1092 (1996), we held that evidence of a prior allegation that a defendant had sexually abused his stepdaughter was admissible at a trial wherein she newly alleged the same type of abuse. The rationale for the admission of the evidence was that an issue at trial was the victim's delay in reporting the abuse charged. Id. at 464-68, 678 A.2d 1092. Because the victim's mother did not believe or support her the first time she claimed sexual abuse by the defendant, the victim initially recanted her first accusation. Id. at 463-66, 678 A.2d 1092. Thus the evidence regarding her first allegation was relevant to explain the victim's delay in reporting the new accusation, which could have led the jury to believe that her claim was not true. Id. at 469, 678 A.2d 1092.
More recently, we considered whether a claim of previous molestation of an older daughter by her father, the defendant, was admissible in a trial for sexual offenses against the defendant's younger daughter, allegedly occurring years later. State v. G.V., 162 N.J. 252, 744 A.2d 137 (2000). There the stories told by the girls were remarkably similar, including the age the molestation began, how and when it proceeded to intercourse, and that it always occurred when the mother worked nights. Id. at 256, 744 A.2d 137.
Although we rejected the admissibility of the evidence based on the reasons advanced by the trial court (intent or absence of mistake), we recognized that the evidence was potentially admissible on material issues such as access and feasibility. We also recognized that that evidence could be used to counter a claim of bias  the so-called "vendetta defense." In connection with the latter, we noted that the bias of the victim against the defendant was an issue materially in dispute, and that other-crimes evidence to prove or disprove it was putatively admissible, subject to the application of the remainder of the Cofield test. Id. at 264-65, 744 A.2d 137.
Citing G.S. and G.V., the trial judge in this case held that evidence of I.B.'s sex assault would be admissible for the narrow purpose of bolstering the credibility of Katie and Ursula, if defense counsel insinuated on cross-examination that they had fabricated *179 the allegations due to bias. He said:
In G.S., the Supreme Court said that evidence of prior sexual abuse was admissible as other crimes in evidence pursuant to R. 404(b) as relevant to the defendant's motive, absence of mistake, or accident, and to the victim's credibility.
. . . .
Again, in State [v.] G.V., the court allowed prior abuse allegations to bolster victim's credibility and to show lack of bias on the part of the victim.
. . . .
... I'm going to permit it only after cross-examination. ... Depending on what [defense counsel's] cross-examination is.
The Appellate Division disagreed and distinguished this matter from G.S., declaring that "neither of the purposes for which the other crimes evidence was admitted in G.S. appl[ied]." In ruling, the panel noted that in G.S. the previous accusation had been made by the same victim, and was admitted for the purpose of explaining the delay in her reporting the abuse and in responding to attacks on her credibility based on the delay. G.S., supra, 145 N.J. at 469, 678 A.2d 1092. Accordingly, in G.S., "[t]here was a logical nexus between the prior course of conduct with a recantation and the assertion that the new allegations were also made up, in each case for some specific purpose for which evidence was presented."
Regarding G.V., the panel stated:
We do not read G.V. as a blank check for the admission of evidence that a defendant sexually molested another person in any trial for a sexual offense in order to bolster the credibility of the victim in that trial and to refute any claim of bias by the victim against the defendant.
The panel noted that this case bears no resemblance to G.V., which involved two similar sets of accusations by sisters living in the same household, which were likely admissible for other relevant purposes. Here, I.B. was a three-year-old boy, Katie an eleven-year-old girl,[5] and no evidence of a common pattern or motive was proffered. Nor were issues of access or feasibility raised. The panel emphasized:
[t]he only manner in which the I.B. incident could serve to bolster [Katie]'s credibility and refute any allegation of bias by her against defendant would be from an inference that [Katie] must be telling the truth because defendant engaged in sexual misconduct against a child before, and thus he has a propensity to engage in such conduct and must have done so with [Katie.] This, of course, is the precise purpose for which other crime evidence is not permitted.
We agree with the panel's analysis in respect of both cases. The reasons for which the other-crimes evidence was admitted in G.S. were finely honed and directed at specific issues in the case  in particular, to explain a delay in reporting and to counter the natural inference that such delay is an indicator of the falseness of the challenge. G.S., supra, 145 N.J. at 469, 678 A.2d 1092. That kind of carefully-focused analysis is what is required by N.J.R.E. 404(b). See, e.g., State v. Oliver, 133 N.J. 141, 153, 627 A.2d 144 (1993) (permitting evidence of assaults on women at defendant's home where others were present downstairs to prove feasibility of occurrence in case being tried); State v. Cusick, 219 N.J.Super. 452, 464-65, 530 A.2d 806 (App.Div.) (holding other sex assaults admissible at trial to prove lack of *180 mistake where defendant argued sexual contact with victim was inadvertent), certif. denied, 109 N.J. 54, 532 A.2d 1118 (1987).
Likewise, we do not read G.V. as an automatic basis for the admission of other-crimes evidence to counter a vendetta defense. Indeed, in G.V., we specifically ruled on the unique facts before us, which left open the possibility that the evidence could be admitted for legitimate purposes, such as access and feasibility. Further, plan or scheme might have provided potential grounds for admission in that case as well. Thus we have no quarrel with the ultimate holding in G.V. that the evidence was admissible subject to the remainder of the Cofield analysis.
However, as the Appellate Division here aptly observed, any interpretation of G.V. "as a blank check for the admission of" other-crimes evidence in a bias case is a misreading of the opinion. Indeed, such a reading would confound the well-established rule that other-crimes evidence is not admissible solely to bolster the credibility of a witness against the defendant, Darby, supra, 174 N.J. at 520, 809 A.2d 138, or as the basis for an inference that the victim's version of the events is true, Stevens, supra, 115 N.J. at 306, 558 A.2d 833. Rather, the evidence may only be admitted if it satisfies the requirements of N.J.R.E. 404(b) and is not offered "to prove the disposition" of the defendant toward criminality. Here, what was proffered was an unrelated sex crime, which was only linked to the bias of the State's witnesses by the notion that if defendant did it before, he likely did it again, thus supporting the credibility of Katie and Ursula. Indeed, when questioned at oral argument, the State was unable to suggest any other basis on which the crime against I.B. could be considered to bear on the bias of Katie and Ursula. Because the admission of such propensity evidence is unmoored from the principles informing N.J.R.E. 404(b), the abuse of I.B. had no purpose in this case. We are thus in full accord with the Appellate Division's analysis of that issue and its conclusion that the evidence was inadmissible here.
However, we part company from that court insofar as it held that the trial judge's error was harmless. An error is harmful if it was "clearly capable of producing an unjust result." R. 2:10-2; State v. Nero, 195 N.J. 397, 409, 949 A.2d 832 (2008). Although the improper other-crimes evidence was never actually admitted here, defendant paid a price to keep it out. Indeed, the threat of its admission forced defendant to alter his trial strategy completely and effectively precluded him from presenting the vendetta theory, which was his central, if not sole, defense. Defense counsel did not overtly refer to bias during his opening or summation, nor did he directly confront Katie or Ursula on that point on cross-examination. Even if, as suggested by the appellate panel, Ursula and Katie would have "undoubtedly denied" their bias if cross-examined on the issue, the jury still would have had the opportunity to evaluate their tone, manner, and body language, and accordingly, to assess their credibility. "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested[,]" Davis v. Alaska, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347, 353 (1974), and defendant was denied a complete opportunity to utilize that essential tool. This was a credibility case from stem to stern. As such, we cannot say that an erroneous ruling diluting defendant's ability to challenge the credibility of the victim and her mother was harmless. We therefore reverse the Appellate Division's contrary conclusion.

*181 V.
We turn finally to defendant's contention that the trial judge erred in invoking the Rape Shield Law, N.J.S.A. 2C:14-7, to bar admission of the hospital record suggesting that Katie "had sex 3 months ago one time."
The Rape Shield Law provides that in prosecutions for various sexual offenses, "evidence of the victim's previous sexual conduct shall not be admitted nor reference made to it in the presence of the jury except" in certain limited circumstances enumerated in the statute. N.J.S.A. 2C:14-7(a). The statute provides that when a defendant seeks to introduce evidence of the victim's previous sexual contact, the trial "court shall conduct a hearing in camera to determine the admissibility of the evidence." Ibid.
The purpose of the Rape Shield Law "is to protect the privacy interests of the victim while ensuring a fair determination of the issues bearing on the guilt or innocence of the defendant." State v. Garron, 177 N.J. 147, 165, 827 A.2d 243 (2003), cert. denied, 540 U.S. 1160, 124 S.Ct. 1169, 157 L.Ed.2d 1204 (2004). The statute protects against "unwarranted and unscrupulous foraging for character-assassination information about the victim." Ibid. However, "if evidence is relevant and necessary to a fair determination of the issues, the admission of the evidence is constitutionally compelled." Id. at 171, 827 A.2d 243 (citation omitted).
In State v. Budis, 125 N.J. 519, 593 A.2d 784 (1991), we articulated a two-step process for determining the admissibility of such evidence. The first step is to "ascertain, apart from the Rape Shield Statute, whether the evidence was relevant to the defense[,]" Budis, supra, 125 N.J. at 532, 593 A.2d 784:
The probative value of the prior acts depends on clear proof that they occurred, that the acts are relevant to a material issue in the case, and that they are necessary to the defense. ... When evidence is offered to show a child's knowledge of sexual acts, its relevance also depends on whether the prior abuse closely resembles the acts in question.
[Id. at 532-33, 593 A.2d 784 (citations omitted).]
In this case, defendant argues that evidence of Katie's previous sexual contact was "critical to defendant's right to confront the charge against him by explaining how a 12-year-old girl might know enough about sexual penetration and sexual ejaculation to make the claims she did[,]" as well as explaining Ursula's statement that Katie's vaginal opening "looked bigger than ... a normal child's at that time[.]" If there were clear proof that Katie had engaged in sexual contact with another person, and that the contact included vaginal and/or anal intercourse, and ejaculation, that might well be relevant to the defense. As in Budis, a jury might wonder how an eleven-year-old would be familiar with such actions unless she had been victimized. But see State v. Schnabel, 196 N.J. 116, 131, 952 A.2d 452 (2008) (in light of present day realities, rejecting defense's assertion that two girls, aged fourteen and seventeen, would lack sufficient knowledge to describe sexual abuse without prior sexual experience).
However, as the trial court and Appellate Division found, the proffered evidence was simply too thin. It consisted of a single notation in a medical report that stated: "11 year old female [] burning sensation when she urinate [sic] and also frequency of urination had sex 3 months ago one time [ ] vaginal discharge." That notation does not satisfy the requirement that there be "clear proof" that the prior *182 acts occurred. Budis, supra, 125 N.J. at 532-33, 593 A.2d 784. The Appellate Division noted that that reference may have been a typographical error, meant to signify three years, not three months, which was approximately when Katie said defendant abused her. Moreover, the notation does not include any specific facts about the incident. Cf. id. at 527, 534, 593 A.2d 784 (finding, where State conceded occurrence and similarity of previous sexual abuse, evidence relevant to "rebut[] inference that [victim] acquired the knowledge to describe sexual matters from her experience with defendant"). Thus, there is no way to tell from the evidence defendant proffered whether the alleged prior sexual contact was similar to defendant's alleged abuse, or even separate from it; the reference may well have been to defendant's abuse of Katie.
Accordingly, the Appellate Division correctly ruled that evidence sufficient to counter the Rape Shield Law had not been adduced.

VI.
Recapping, we decline to adopt a per se rule of exclusion in a case in which a child sex abuse victim's taped statement is lost. We reiterate that the totality of circumstances standard is the appropriate benchmark for the admissibility of a tender-years statement under N.J.R.E. 803(c)(27). We likewise reaffirm our holdings in Cook, supra, 179 N.J. 533, 847 A.2d 530, and Branch, supra, 182 N.J. 338, 865 A.2d 673, to the effect that simultaneous notes taken of a child sex abuse victim's interview should not be destroyed but should be maintained through trial.
We likewise decline to interpret our decisions in G.S., supra, 145 N.J. 460, 678 A.2d 1092, and G.V., supra, 162 N.J. 252, 744 A.2d 137, as providing an automatic basis for the admission of other-crimes evidence to counter a bias or vendetta defense. Rather, such other-crimes evidence may only be admitted if it satisfies N.J.R.E. 404(b) and is not offered to prove the defendant's criminal propensity.

VII.
The judgment of the Appellate Division is reversed. The matter is remanded for a new trial consistent with the principles to which we have adverted.
Justice RIVERA-SOTO, concurring in part and dissenting in part.
The majority reaches five separate conclusions in which I concur: (1) that the admission of the child victim's statement under N.J.R.E. 803(c)(27) was "fully supported by the evidence and legally unassailable[,]" ante at 252, 997 A.2d at 175; (2) that the per se rule advanced by defendant that would bar any child statement not videotaped should be rejected, and that "the absence of a tape, standing alone, is not dispositive[as i]t is to be considered along with all the other factors we have previously set forth ... as relevant to trustworthiness[,]" ante at 253, 997 A.2d at 176; (3) that witness interview notes should be preserved, ante at 253-54, 997 A.2d at 176; (4) that State v. G.S., 145 N.J. 460, 678 A.2d 1092 (1996) (holding that evidence of uncharged prior sexual assaults on same victim are admissible in respect of victim's credibility), is not controlling here, ante at 258-59, 997 A.2d at 179-80; and (5) that the Rape Shield Law, N.J.S.A. 2C:14-7, barred the admission of the child victim's alleged prior sexual acts, ante at 260-63, 997 A.2d at 180-82. Each of those conclusions dovetails with the Appellate Division's decision below.
I must part company with both the Appellate Division and the majority in one *183 fundamental respect: in my view, the trial court's evidentiary determination that the State would be permitted to rebut defendant's "vendetta defense" with proof of defendant's prior sexual assault on another child was proper and entirely in accord with State v. G.V., 162 N.J. 252, 263-65, 744 A.2d 137 (2000). I also part company with the majority in its rejection of the Appellate Division's separate conclusion  that, even assuming the trial court's evidentiary determination that the State would be permitted to rebut defendant's "vendetta defense" with proof of defendant's prior sexual assault on another child was in error, such error was harmless  thereby requiring a new trial, ante at 258-60, 263, 997 A.2d at 179-80, 182.

I.
In G.V., this Court held that proof of a defendant's prior but uncharged sexual assaults is admissible to rebut a "vendetta defense," that is, that the victim/witness fabricated the allegations against defendant as a means of "getting back at" defendant. G.V., supra, 162 N.J. at 263-65, 744 A.2d 137. As G.V. explains, if it is a theory of the defense that the victim's assertion of a sexual assault was fabricated "as revenge" against the defendant, id. at 263, 744 A.2d 137, then the evidence of a defendant's prior similar acts can be deemed relevant as it "tends `to prove or disprove any fact of consequence to the determination of the action.'" Ibid. (quoting N.J.R.E. 401). Particularly where, as here, a defendant in a sexual assault prosecution claims that the victim's accusations are motivated by revenge, proofs that the defendant previously committed similar sexual assaults is and rightly should be admissible to rebut the claim of bias the defendant has raised against his accuser. Id. at 264, 744 A.2d 137 ("It is only when defendant puts the bias of the witness (on account of a vendetta) into issue that the evidence would be admissible."). G.V. also sets forth the procedure to be followed:
If, at the hearing prior to trial under Evidence Rule 104, defendant disclaims the use of the vendetta defense, the State would have no basis for admitting the evidence. On the other hand, if defendant renews the vendetta defense, it appears to us that the testimony of the [prior, uncharged sexual assaults] is relevant to show that the testimony of [the child victim] is not the product of bias. Of course, the trial court would have to ... balanc[e] the probative worth of the evidence against its prejudicial effect.
[Id. at 264-65, 744 A.2d 137.]
That is precisely what occurred here. When defendant asserted a "vendetta defense," the State sought and was granted a Rule 104 hearing to determine the admissibility of rebuttal proofs that defendant had sexually assaulted another child before he committed the acts for which he stood charged. As the majority correctly notes, the trial court performed a Cofield[1] analysis and, applying N.J.R.E. 404(b), ruled that "evidence of defendant's [prior] sexual assault of [another child] would be admissible to bolster the credibility of [the victim] and to rebut claims of bias, but only after cross-examination, if defense counsel challenged the credibility of [the victim] and her mother by placing their bias in issue." Ante at 242-43, 997 A.2d at 169.
The majority rejects that ruling, asserting without explanation that G.V. does not provide "an automatic basis for the admission of other-crimes evidence to counter a vendetta defense." Ante at 259, 997 A.2d at 180. Without overruling or otherwise *184 rejecting G.V.'s clear holding, the majority nevertheless repeats the Appellate Division's reasoning and asserts that "any interpretation of G.V. `as a blank check for the admission of' other-crimes evidence in a bias case is a misreading of the opinion." Ante at 259, 997 A.2d at 180. Tagging the evidence of defendant's prior sexual assaults with the death warrant of "propensity evidence," ante at 260, 997 A.2d at 180, the majority declares that those proofs "had no purpose in this case." Ante at 260, 997 A.2d at 180.[2]
If G.V.'s recognition that a defendant's vendetta defense can be rebutted by proof of prior similar acts retains any vitality, then the majority's conclusion clearly is in error. If the State is to be barred from rebutting a vendetta defense through competent and relevant proofs of prior similar acts, then how can that defense ever be rebutted? Under the majority's now emasculated view of G.V., a defendant may assert willy-nilly that the accusations against him were manufactured by the victim solely to exact revenge, yet the prosecution is powerless to use plainly probative evidence to demonstrate that the claimed vendetta defense is without foundation. The effect is to sanction, in favor of defendant, an unfettered license to fabricate charges of a victim's bias and ill motive, a result that neither achieves justice nor makes any sense.
The better reasoned and more impartial view was earlier recognized by this Court in G.V., which specifically informed and guided the conditions on admissibility the trial court imposed: a defendant should remain free to assert a vendetta defense, but he may not do so with utter impunity; that defense can be rebutted by otherwise relevant proofs that the accusations made against defendant are "not the product of bias." G.V., supra, 162 N.J. at 264, 744 A.2d 137.
Thus, to the extent both the Appellate Division and the majority conclude otherwise and sub silentio overrule G.V., I respectfully dissent.

II.
Even if the majority correctly concludes that the trial court abused its discretion in allowing the State  but only in rebuttal  to introduce proof of defendant's prior sexual assaults to rebut his "vendetta defense," it nonetheless incorrectly concludes that a new trial is warranted here. In my view, the Appellate Division correctly analyzed this question when it reasoned that
the other crime evidence was never presented to the jury. Thus, the severe prejudice that would have resulted had it been presented did not occur. [D]efendant was not denied the opportunity to mount a defense based upon his assertion that [the child victim] and her mother fabricated these charges to get him out of the house. The assertion is completely unfounded and unsubstantiated. Had the judge ruled that the other crime evidence was not admissible, and if defense counsel would have asked [the child victim] and her mother whether they concocted this story to get him out of the house, they would have undoubtedly denied it, consistent with their unwavering testimony and pretrial statements *185 throughout this case. [D]efendant proffered no other evidence (unlike in G.S. and G.V.) to support his assertion. [T]herefore, ... the erroneous ruling did not affect the outcome of the trial. Accordingly, the error was harmless and does not warrant reversal of defendant's convictions.
The only substantive difference between the majority's view and the Appellate Division's decision lies in whether the trial court's ruling concerning the admission of the "other crimes" evidence under N.J.R.E. 404(b) and the four-prong test of Cofield, supra, was harmless. Because I agree with the Appellate Division that, in the context of this case, the trial court's ruling, even if in error, was harmless, I further respectfully dissent.

III.
In the circumstances presented, there is no basis for determining that the trial court abused its discretion in allowing the use of prior bad acts evidence to rebut any claimed "vendetta defense." In any event and based on the facts in this case, that evidentiary determination, even if in error, was harmless. For those reasons, the judgment of the Appellate Division should be sustained and defendant's conviction and sentence affirmed. Because the majority fails to do so, I must dissent.
Justice HOENS joins in this opinion.
For reversal and remandment  Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN and WALLACE  5.
Concurrence in part; dissenting in part  Justices RIVERA-SOTO and HOENS  2.
NOTES
[1] Both names are pseudonyms.
[2] The name is a pseudonym.
[3] The events in this case preceded Cook and Branch.
[4] As we have stated, the evidence of similarity and temporality

is not one that can be found in the language of Evidence Rule 404(b). Cofield's second prong, therefore, need not receive universal application in Rule 404(b) disputes. Its usefulness as a requirement is limited to cases that replicate the circumstances in Cofield.
[State v. Williams, 190 N.J. 114, 131, 919 A.2d 90 (2007).]
[5] Katie was eleven when first interviewed by Henriquez in April 2003.
[1] State v. Cofield, 127 N.J. 328, 338, 605 A.2d 230 (1992).
[2] As a practical matter, the majority has engaged in an exercise in misdirection: without expressly admitting its purpose, it has incorporated that portion of the majority writer's earlier dissent in G.V., which rejected G.V.'s "separate determination that [the prior bad acts] testimony may be relevant, and therefore possibly admissible on another basis  to refute the so-called `vendetta defense.'" G.V., supra, 162 N.J. at 265, 744 A.2d 137 (Long, J., concurring in part and dissenting in part). In effect, while not outright reversing G.V., the majority has made it irrelevant.