SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**State v. Thomas L. Scott (A-86-15) (077434)**

**Argued February 27, 2017 -- Decided June 28, 2017**

**TIMPONE, J., writing for the Court.**

This appeal raises the issue of whether a defendant's mother, who purportedly lied to law enforcement officers twice in the past in order to assist her son in evading prosecution, may be cross-examined on those prior instances as evidence of her bias.

On November 27, 2012, Lauren Halbersberg, defendant's friend, and Jordan Scott, defendant's cousin and known drug user, were at defendant Thomas L. Scott's apartment. According to Halbersberg, Darlene Barbella, defendant's mother, visited defendant's apartment and noticed two packets of heroin lying on a table in the living room. She took the packets, placed them in the pocket of a pair of jeans that were lying on the couch next to Jordan, and returned the jeans to the couch. Halbersberg added that, during this time, defendant prepared to shower, lacking any knowledge of the heroin placement. After showering, defendant retrieved from the couch the jeans now containing two packets of heroin and put them on. Defendant left shortly thereafter. Halbersberg concluded by testifying that because of the "commotion," she failed to warn him of the heroin in his jeans.

Detective Zotti observed defendant leave his apartment. Zotti knew defendant from previous arrests. Zotti approached defendant and started a conversation. In the meantime, dispatch advised Zotti of an active arrest warrant for defendant. Zotti made the arrest, conducting a search incident to the arrest, which yielded the two packets of heroin. While being escorted to a patrol car, defendant uttered, "I did not know that the heroin was in my pocket, I have not worn these pants in weeks, I would have eaten it, if I had known I had it on me."

A grand jury indicted defendant for third-degree possession of heroin. Defendant filed a motion in limine, seeking a preliminary ruling on the admissibility of the testimony of his mother, Barbella, from an interview she gave to an investigator for the public defender's office a little over a year after the incident.

During that interview, Barbella noted that Jordan was lying on the couch and that she spotted the packets of heroin and put them into the front pocket of the jeans lying on the couch right next to Jordan. Because of their proximity to Jordan, Barbella assumed the jeans were his. Barbella further stated that Jordan returned to her home later that day banging on the side door, shouting, "Tommy got arrested . . . . Tommy's got my drugs and money."

In response, the State sought to introduce evidence that, in two previous instances, Barbella lied to officers in order to "cover up" for defendant. As the State recounted the first instance, Barbella told officers that defendant was not home, but they later entered the house and found defendant. In the second instance, Barbella allegedly gave a written statement to police regarding defendant's involvement in a burglary, which she later admitted was false.

After hearing arguments from both parties, the trial court ruled that the State's evidence regarding "Ms. Barbella['s] . . . propensity to cover up her son's wrongdoings" was "highly relevant" and therefore "admissible both on cross examination and on rebuttal if she elects to take the stand." The defense made no further objections to the ruling. Instead, defendant made a tactical decision not to call Barbella and called Halbersberg, who gave testimony strikingly similar to that expected from Barbella. Defendant was convicted as charged.

The Appellate Division affirmed the trial court's in limine ruling. The panel held that the evidence was admissible to impeach Barbella through bias—a position adopted by the State for the first time on appeal. Alternatively, the panel reasoned that any error was harmless on two fronts: (1) Barbella's testimony was cumulative of Halbersberg's; and (2) the State could have presented the same bias argument through evidence of familial relationship alone. The Court granted defendant's petition for certification. 227 N.J. 22 (2016).

1

**HELD**: The evidence proffered by the State goes far afield of a proper bias inquiry. The evidence is inadmissible under the dictates of New Jersey Rules of Evidence 403 and 608, which govern admissibility of prior bad acts and character evidence for truthfulness. That error prevented defendant from fully developing his defense at trial and deprived the jury of key witness testimony. Exclusion of testimony central to a defendant's claim or defense, if otherwise admissible, cannot be held to be harmless error.

1. As a preliminary question, the Court discusses whether the State was permitted to raise a different justification for admissibility on appeal. Because the current record is not "barren of facts that would shed light on [the] issue," State v. Witt, 223 N.J. 409, 418 (2015), it is appropriate to review the bias argument. (pp. 10-12)

2. New Jersey's Rules of Evidence preclude the use of specific instances of conduct to attack the credibility of a witness, N.J.R.E. 405, unless the prior act was a "false accusation against any person of a crime similar to the crime with which defendant is charged," N.J.R.E. 608. The Rules do not explicitly discuss bias as a permissible means of impeachment; however, this Court has long found the use of bias to attack a witness's credibility proper. Where a party seeks to demonstrate bias, it may do so by introducing extrinsic evidence. (pp. 13-15)

3. The query, as it relates to bias, is "the relationship between a [defendant] and a witness." United State v. Abel, 469 U.S. 45, 52 (1984). The relationship between defendant and Barbella could have been probed by eliciting the fact that Barbella was defendant's mother or asking whether she would lie to protect her son. That is the permissible limit of the State's inquiry into her bias. The only other reason for which the State could have proffered the prior-acts testimony is to show Barbella's character for untruthfulness. Even if Rule 608 did not specifically bar the proffered evidence, its probative value was substantially outweighed by its prejudicial nature. The trial court abused its discretion in ruling that the proposed impeachment testimony was admissible against Barbella. (pp. 15-17)

4. Although the prior-bad acts evidence was ultimately not admitted, defendant paid a significant price to keep it out. The evidentiary error here deprived the jury of the opportunity to evaluate Barbella's tone, manner, and body language, and accordingly, to assess her credibility. An error resulting in the jury's inability to assess the credibility of the defense's key witness is ordinarily not harmless. Nor is Barbella's testimony merely cumulative. Rather, it is corroborative. Both testimonies are critical to the defense; the synergy of the two make the theory significantly more plausible. The trial court's in limine ruling altered defendant's trial strategy, precluding him from presenting—and the jury from assessing—a key witness. The error was harmful. (pp. 17-20)

The judgment of the Appellate Division is **REVERSED** and the matter is remanded for a new trial.

**CHIEF JUSTICE RABNER, CONCURRING,** notes that most modern courts follow the common law tradition and permit questioning about specific instances of conduct that are probative of a witness's character for truthfulness and opines that it is time to consider whether Rule 608 should be revised to allow cross-examination, in a controlled fashion, into specific instances of conduct that are probative of the witness's character for truthfulness.

**JUSTICE ALBIN, CONCURRING**, writes separately to address the proposal that New Jersey should align N.J.R.E. 608 with its federal counterpart. That would allow the use of specific instances of untruthfulness to impeach a witness's character for veracity and would also encourage parties to forage for impeachment evidence, in Justice Albin's view. Justice Albin sees no sound justification for abandoning New Jersey's common-law rule.

**JUSTICE PATTERSON, CONCURRING IN PART AND DISSENTING IN PART**, agrees that the trial court's ruling was error but parts company with the majority with respect to the question of harmless error. According to Justice Patterson, Barbella's testimony would not have afforded defendant a trial strategy that was unavailable to him in her absence. The strategy was employed—and it failed. Barbella's testimony would have undermined an already farfetched theory and done the defense more harm than good, in Justice Patterson's view.

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA and ALBIN join in JUSTICE TIMPONE's opinion. CHIEF JUSTICE RABNER filed a separate, concurring opinion, in which JUSTICES PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join. JUSTICE ALBIN filed a separate, concurring opinion, in which JUSTICE LaVECCHIA joins. JUSTICE PATTERSON filed a separate, partially concurring and partially dissenting opinion, in which JUSTICES FERNANDEZ-VINA and SOLOMON join.**

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

       v.

THOMAS L. SCOTT (a/k/a JAMES
LONGENBERGER, and CHRISTOPHER
TUREAUD),

    Defendant-Appellant.


      Argued February 27, 2017 – Decided June 28, 2017

      On certification to the Superior Court,
      Appellate Division.

      Stephen W. Kirsch, Assistant Deputy Public
      Defender, argued the cause for appellant
      (Joseph E. Krakora, Public Defender,
      attorney).

      Ian D. Brater, Assistant Prosecutor, argued
      the cause for respondent (Christopher J.
      Gramiccioni, Monmouth County Prosecutor,
      attorney; Ian D. Brater, of counsel and on
      the brief, and Mary R. Juliano, Special
      Deputy Attorney General/Acting Assistant
      Prosecutor, on the brief).


    JUSTICE TIMPONE delivered the opinion of the Court.

    This appeal raises the issue of whether a defendant's

mother, who purportedly lied to law enforcement officers twice

in the past in order to assist her son in evading prosecution,

may be cross-examined on those prior instances as evidence of her bias.

Defendant Thomas Scott was charged with possession of heroin. He argued that he did not knowingly possess the heroin because someone else placed it in his jeans pocket before he put them on. In support, defendant sought to call his mother, Darlene Barbella, to testify that she found the heroin in defendant's apartment in close proximity to defendant's cousin and known drug user, Jordan Scott, and that she placed the heroin in the pocket of a pair of jeans she believed belonged to Jordan.

Defendant filed a motion in limine, seeking a preliminary ruling on the admissibility of certain evidence, including Barbella's testimony. In response, the State sought to introduce evidence of two prior occasions on which Barbella allegedly lied to police to cover for her son, defendant. The trial court ruled the State's impeachment evidence admissible. Defendant chose not to call Barbella at trial, instead calling Lauren Halbersberg, defendant's friend, to testify to the same events. The Appellate Division affirmed the trial court's determination that the evidence was admissible based upon the State's harmless error and bias arguments.

We find that the evidence proffered by the State goes far afield of a proper bias inquiry into Barbella's relationship

2

with defendant.  The evidence is inadmissible under the dictates

of New Jersey Rules of Evidence 403 and 608, which govern

admissibility of prior bad acts and character evidence for

truthfulness.  That error prevented defendant from fully

developing his defense at trial and deprived the jury of key

witness testimony.  Accordingly, we reverse the Appellate

Division's findings that the trial court's error was harmless

and that bias supported the trial court's admissibility ruling.

I.

We glean the relevant facts from the trial testimony.  On

November 27, 2012, Halbersberg and Jordan were at defendant's

home, a second-floor apartment in a duplex in Long Branch.

Barbella owned the duplex and lived in the first-floor

apartment.

According to Halbersberg, Barbella visited defendant's

apartment twice that day.  During the second visit, Barbella

noticed two packets of heroin lying on a table in the living

room.  She took the packets, placed them in the pocket of a pair

of jeans that were lying on the couch next to Jordan, and

returned the jeans to the couch.  Halbersberg added that, during

this time, defendant prepared to take a shower, lacking any

knowledge of the heroin placement.

After showering, defendant retrieved from the couch the

jeans now containing two packets of heroin, took them into the

3

bathroom, and put them on.  Defendant left shortly thereafter, when a friend picked him up at the apartment.  Halbersberg concluded by testifying that because of the "commotion," she failed to warn him of the heroin in his jeans.

Detective Zotti of the Long Branch police department observed defendant leave his apartment and get into the front-passenger seat of a vehicle.  Zotti knew defendant from previous arrests.  He asked his dispatcher to perform a warrant check on defendant while he began following defendant in the vehicle.  Defendant was driven a short distance; the vehicle stopped, and defendant exited.  Zotti approached defendant and started a conversation.  In the meantime, dispatch advised Zotti of an active arrest warrant for defendant.  Zotti made the arrest, conducting a search incident to the arrest, which yielded the two packets of heroin.  While being escorted to a patrol car, defendant uttered, "I did not know that the heroin was in my pocket, I have not worn these pants in weeks, I would have eaten it, if I had known I had it on me."

A Monmouth County grand jury indicted defendant for third-degree possession of heroin, N.J.S.A. 2C:35-10(a)(1).  In preparation for trial, defendant filed a motion in limine, seeking a preliminary ruling on the admissibility of certain testimony.  Specifically, defendant successfully sought introduction of his out-of-court statements to the police

4

regarding his claimed ignorance of the heroin in his jeans. Defendant also sought to introduce the testimony of his mother, Barbella, based on an interview she gave to an investigator for the public defender's office a little over a year after the incident.

During that interview, Barbella recounted her visit to the apartment while defendant was in the shower. She noted that Jordan was lying on the couch "semi-conscious," appearing to be "heavily under the influence of drugs," and that she told him to get out of her house. She then spotted the packets of heroin and put them into the front pocket of the jeans lying on the couch right next to Jordan. Because of their proximity to Jordan, Barbella assumed the jeans were his. Barbella further stated that Jordan returned to her home later that day banging on the side door, shouting, "Tommy got arrested . . . . Tommy's got my drugs and money."

In response, the State sought to introduce evidence that, in two previous instances, Barbella lied to officers in order to "cover up" for defendant. As the State recounted the first instance, officers saw defendant working on a car in his driveway. As they approached, defendant quickly retreated into the garage and shut the door. When the officers confronted Barbella about defendant's whereabouts, she told them that he was not home. In response to an unrelated medical emergency,

5

officers later entered the house and found defendant inside.  In the second instance, Barbella allegedly gave a written statement to police regarding defendant's involvement in a burglary, which she later admitted was false.

Defendant argued the inadmissibility of Barbella's prior false statements to police pursuant to N.J.R.E. 404(b). Defendant claimed the State compounded the problem by failing to move for a Cofield hearing to determine admissibility under Rule 404(b).  See State v. Cofield, 127 N.J. 328 (1992).  The State countered that the evidence very belatedly came into its possession; it raised the issue as soon as practicable and, most importantly, the evidence satisfied the Cofield test.

After hearing arguments from both parties, the trial court ruled that the State's evidence regarding "Ms. Barbella['s] . . . propensity to cover up her son's wrongdoings" was "highly relevant" and therefore "admissible both on cross examination and on rebuttal if she elects to take the stand."  In examining the arguments under the rules of evidence, the court reasoned that

> [t]his really isn't 404(b).  It's more in the nature of Rule 608, which says the credibility of a witness in a criminal case may be attacked by evidence that the witness made a prior false accusation against any person of a crime similar to the crime with which the defendant is charged if the Judge preliminarily determines, by a hearing pursuant to Rule 104,

6

> that the witness knowingly made a prior false accusation.
>
> This is not a case where she made a prior false accusation. It's just the opposite. She gave false information to the police trying to exonerate her son. And 104(a) basically says that when you're dealing with issues of this nature, the Judge makes a determination but he does not have to apply strictly the rules of evidence.

The defense made no further objections to the ruling. Instead, defendant made a tactical decision not to call Barbella. As a substitute, defendant called Halbersberg, who gave testimony strikingly similar to that expected from Barbella.

Defendant was convicted as charged and, based upon a balancing of the aggravating and mitigating factors in N.J.S.A. 2C:44-1, was sentenced to a five-year custodial term with two-and-a-half years of parole ineligibility.

The Appellate Division affirmed the trial court's in limine ruling. The panel confirmed the trial court's rejection of N.J.R.E. 404(b) as a ground for admissibility, in addition to finding the evidence inadmissible under N.J.R.E. 608. The panel also faulted the trial court for relying on Rule 104(a) to avoid strict compliance with the rules of evidence. The panel, nevertheless, held that the evidence was admissible to impeach Barbella through bias -- a position adopted by the State for the first time on appeal. Alternatively, the panel reasoned that

7

any error was harmless on two fronts: (1) Barbella's testimony was cumulative of Halbersberg's, which the jury found unpersuasive; and (2) the State could have presented the same bias argument through evidence of Barbella and defendant's familial relationship alone. We granted defendant's petition for certification. 227 N.J. 22 (2016).

II.

A.

Defendant submits that the trial court appropriately cited N.J.R.E. 608 -- governing impeachment of a witness -- but ultimately misapplied it. According to defendant, Rule 608 specifically prohibits the admission of prior bad acts where they do not relate to a prior conviction or prior false accusation. The preliminary determination that the State would be permitted to cross-examine Barbella on her prior bad acts, defendant contends, violated his federal Fourteenth and Sixth Amendment rights, as well as the corresponding state-constitutional rights.

The violations were compounded, defendant asserts, when the Appellate Division: (1) wrongfully entertained the State's "new-on-appeal bias argument," in violation of State v. Witt, 223 N.J. 409, 418-19 (2015); (2) incorrectly interpreted case law on bias in a manner inconsistent with Rule 608(a); (3) improperly admitted the prior bad acts without conducting a Rule

8

404(b) hearing, diverging from the holding in Cofield, supra, 127 N.J. at 338-42; and (4) improperly found that the errors were harmless.

## B.

The State counters that the Appellate Division's consideration of the bias argument is consonant with Witt because the admissibility of the impeachment was contested at trial, leaving a fulsome record sufficient to resolve the legal issue on appeal. Next, relying heavily on the United States Supreme Court's opinion in United State v. Abel, 469 U.S. 45, 105 S. Ct. 465, 83 L. Ed. 2d 450 (1984), the State submits that proving bias by specific acts is consistent with the strictures of N.J.R.E. 608.

Even if the trial court's ruling were in error, the State submits, the error was harmless because: (1) defendant's theory of the case was "inherently implausible" and cumulative testimony would not have altered the theory's plausibility; (2) Barbella's proffered testimony corroborated only a small portion of Halbersberg's testimony, each of which was partially inconsistent with the other; and (3) if Barbella's testimony were permitted, there is not a "reasonable probability the verdict would be any different."

## III.

"[T]he decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion." Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010). We therefore apply a deferential standard in reviewing a trial court's evidentiary rulings and uphold its determinations "absent a showing of an abuse of discretion." State v. Perry, 225 N.J. 222, 233 (2016) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). A reviewing court must not "substitute its own judgment for that of the trial court" unless there was a "clear error in judgment" -- a ruling "so wide of the mark that a manifest denial of justice resulted." Ibid. (quoting State v. Marrero, 148 N.J. 469, 484 (1997)).

## IV.

As a preliminary question, we first discuss whether the State was permitted to raise a different justification for admissibility on appeal. It is a long-standing principle underlying appellate review that "appeals are taken from orders and judgments and not from opinions . . . or reasons given for the ultimate conclusion." Do-Wop Corp. v. City of Rahway, 168 N.J. 191, 199 (2001); accord State v. Deluca, 168 N.J. 626, 631, 633 (2011) (finding search constitutional under different exception than that relied upon by trial court); Shim v. Rutgers, 191 N.J. 374, 378 (2007) (affirming Appellate Division judgment on different grounds); State v. Nellom, 178 N.J. 192,

196 (2003) (same); Isko v. Planning Bd. of Livingston, 51 N.J. 162, 175 (1968) ("[T]he fact that [the order] was predicated upon an incorrect basis will not stand in the way of its affirmance.").

From that principle we have carved a limited exception in cases where failure to raise the issue created a "record . . . barren of facts that would shed light on [the] issue." Witt, supra, 223 N.J. at 418. In Witt, this Court was faced with the issue of whether exigency permitted the State to bypass the warrant requirement. Id. at 414-15. During a suppression hearing, the defendant challenged the validity of the warrantless search but not the stop itself. Id. at 418. On appeal, defendant challenged the validity of the stop for the first time. Ibid.

In holding that the lawfulness of the stop had not been preserved for appellate review, we reasoned that permitting the delayed challenge would require the State, in future suppression hearings, "to cover areas not in dispute" and require "the State to disprove shadow issues" due to "fear that an abbreviated record [would] leave it vulnerable if the defense raises issues for the first time on appeal." Ibid. The byproduct of holding otherwise would have been to "needlessly lengthen suppression hearings[,] . . . result[ing] in an enormous waste of judicial resources." Ibid.

Even though we come to a different ultimate result than in Witt, the same underlying principles apply here.  The State proffered a rule-based justification for the admissibility of the impeachment testimony, which the trial court apparently accepted.  There was no reason for the State to submit a second justification for the evidence's admissibility.  The facts here present the opposite side of the Witt coin.  Adopting defendant's position would require the State to submit every potential justification for the admission of evidence in fear that the reversal of one explanation on appeal would deny it the benefit of other reasons for admissibility.  As we recognized in Witt, that result would lengthen in limine hearings and would result in an enormous waste of judicial resources.  See ibid.

Unlike Witt, the record here is fully developed.  The alternative justification upon which the State relies is bias.  Even a cursory review of the record reveals sufficient facts upon which the State can base its bias argument.  Because we do not find the current record "barren of facts that would shed light on [the] issue," ibid., we find it appropriate to review the bias argument raised before the Appellate Division and turn to its substance.

V.

A.

12

Our Rules of Evidence start from the proposition that all relevant evidence is admissible, subject to delineated categories of excluded evidence. N.J.R.E. 402 ("Except as otherwise provided in these rules or by law, all relevant evidence is admissible."). Rule 607 permits, "for the purpose of impairing or supporting the credibility of a witness, any party including the party calling the witness [to] examine the witness and introduce extrinsic evidence relevant to the issue of credibility," unless an exception within that rule applies or either Rule 405 or 608 renders the evidence inadmissible.

Those Rules preclude the use of specific instances of conduct to attack the credibility of a witness. N.J.R.E. 405 provides that "[s]pecific instances of conduct not the subject of a conviction of a crime shall be inadmissible," and N.J.R.E. 608 indicates that "a trait of character cannot be proved by specific instances of conduct" unless the prior act was a "false accusation against any person of a crime similar to the crime with which defendant is charged." Otherwise, relevant evidence may also be excluded on the ground that "its probative value is substantially outweighed by the risk of . . . undue prejudice." N.J.R.E. 403.

The Rules do not explicitly discuss bias as a permissible means of impeachment; however, this Court has long found the use of bias to attack a witness's credibility proper. See, e.g.,

13

State v. Bass, 224 N.J. 285, 302 (2016) ("[C]laimed bias of a witness is generally an appropriate inquiry in cross-examination in criminal trials[.]"); State v. R.K., 220 N.J. 444, 458 (2015) ("At trial, a party may introduce evidence that an adverse witness is biased."); State v. Pontery, 19 N.J. 457, 472 (1955) ("[I]t is proper for either the defense or the prosecution to show the interest of a witness as bearing upon the witness' credibility.").  Where a party seeks to demonstrate bias, it may do so by introducing extrinsic evidence.  R.K., supra, 220 N.J. at 459.

We find the United States Supreme Court's decision discussing the interrelation of bias and specific instances of bad conduct instructive here.  In Abel, supra, the District Court permitted the introduction of a witness's membership in the Aryan Brotherhood, of which the defendant was also a member, to prove that the testimony the witness would give was biased. 469 U.S. at 47, 105 S. Ct. at 466-67, 83 L. Ed. 2d at 454.  The Court commenced the analysis by defining bias as "the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party."  Id. at 52, 105 S. Ct. at 469, 83 L. Ed. 2d at 457.  Armed with that definition, the Court reasoned that "[a] witness' and a party's common membership in an organization, even without proof that the witness or party

14

has personally adopted its tenets, is certainly probative of bias." Ibid. In responding to the defendant's argument that his membership was a specific instance of conduct, the Court -- relying on the principle that evidence inadmissible for one purpose may be admissible for another -- found it of no consequence that the Aryan Brotherhood's tenet requiring perjury "might also impeach his veracity directly" as propensity evidence. Id. at 56, 105 S. Ct. at 471, 83 L. Ed. 2d at 460.

B.

We do not quarrel with the State's position, which is well established, that cross-examining witnesses in criminal trials based on their bias towards the accused is permitted. We do not find, however, that the prior instances of Barbella's lying to law enforcement officers are probative of her bias. The query, as it relates to bias, is "the relationship between a [defendant] and a witness." Id. at 52, 105 S. Ct. at 469, 83 L. Ed. 2d at 457. The relationship between defendant and Barbella could have been probed by eliciting the fact that Barbella was defendant's mother. It is equally true that the State could have asked Barbella about whether she would lie to protect her defendant son. That is the permissible limit of the State's inquiry into her bias. When the State's evidence goes beyond an inquiry into the relationship between the defendant and the

15

witness, the shelter provided by bias erodes and the State must seek refuge under other admissibility grounds.

Reviewing the remaining evidentiary rules, we find the State's remaining arguments unavailing as well.  The only other reason for which the State could have proffered the prior-acts testimony is to show Barbella's character for untruthfulness. Like both the trial court and the Appellate Division, we find the enumerated exceptions in Rule 404(b) inapplicable.  Further, Rule 608 explicitly excludes specific instances of conduct as a means of proving a character for untruthfulness, permitting only opinion or reputation evidence.

Moreover, even if Rule 608 did not specifically bar the proffered impeachment evidence, we find its probative value substantially outweighed by its prejudicial nature.  The evidence does not only implicate Barbella in prior instances of lying, it also connects defendant to multiple prior criminal episodes.  Examining Barbella on her relationship to defendant was surely probative, but the added benefit of examining her on the past instances of dishonesty was slight.  Because the prejudice extends to both Barbella and defendant, it significantly outweighs the slight probative value gained from cross-examining Barbella on the prior instances.  Consequently, we find that the trial court abused its discretion in ruling in limine that the proposed impeachment testimony was admissible

16

against Barbella.  Based on that finding, it is unnecessary to address whether a <u>Cofield</u> analysis was necessary and we turn, instead, to a discussion of whether the error was harmless.

## VI.

## A.

<u>Rule</u> 2:10-2 directs reviewing courts to disregard "[a]ny error or omission . . . unless it is of such a nature as to have been clearly capable of producing an unjust result."  Known as the harmless error doctrine, that rule "requires that there be 'some degree of possibility that [the error] led to an unjust result.'"  <u>State v. R.B.</u>, 183 <u>N.J.</u> 308, 330 (2005) (alteration in original) (quoting <u>State v. Bankston</u>, 63 <u>N.J.</u> 263, 273 (1973)).  In discussing the extent of error required for reversal, we noted "[t]he possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached." <u>Ibid.</u> (second alteration in original) (quoting <u>Bankston</u>, <u>supra</u>, 63 <u>N.J.</u> at 273).  Exclusion of testimony, however, which is central to a defendant's claim or defense, "if otherwise admissible, cannot be held to be harmless error."  <u>State v. Kelly</u>, 97 <u>N.J.</u> 178, 202-03 (1984).

## B.

Unlike the Appellate Division, we find the trial court's error harmful.  In doing so, we look to evidence outside of

17

defendant's testimony because it is the "sort of evidence that a jury naturally would tend to discount as self-serving." See Skipper v. South Carolina, 476 U.S. 1, 8, 106 S. Ct. 1669, 1673, 90 L. Ed. 2d 1, 9 (1986). We therefore focus primarily on Halbersberg's testimony and the proffer of Barbella's testimony. Barbella was defendant's central witness; who better to corroborate defendant's "unknowing" theory than the person who placed the heroin in his pants. Although the prior-bad acts evidence was ultimately not admitted here, "defendant paid a [significant] price to keep it out." State v. P.S., 202 N.J. 232, 260 (2010).

We agree that it is possible that the jury could have discounted Barbella's testimony, like Halbersberg's, or that the jury would have been persuaded by the State's inevitable bias summation, or that the jurors "might have independently discounted the probative force of the mother's testimony, in light of the family relationship." These mere possibilities, however, do not render an error harmless. Nor can we condone a harmless-error finding based on possibilities alone. The evidentiary error here deprived the jury of the opportunity to "evaluate [Barbella's] tone, manner, and body language, and accordingly, to assess [her] credibility." P.S., supra, 202 N.J. at 260. An error resulting in the jury's inability to assess the credibility of the defense's key witness is

18

ordinarily not harmless. While the dissent may find the defense implausible, that decision is in the sole province of the jury. Judges should not intrude as the thirteenth juror.

Nor do we find Barbella's testimony merely cumulative. Rather, it is corroborative. The testimony of Barbella and Halbersberg illustrate the scenario from different vantage points. Barbella's expected testimony would have her placing the drug packets into the pocket of a stray pair of jeans she believed belonged to her drug-addled nephew. She then left the apartment. Barbella's testimony is important for the jury to consider and evaluate because if believed, she provides a first-hand rationale for placing the packets in the jeans' pocket. Namely, she placed the packets in the jeans and then told Jordan to leave, which would have effectively removed the heroin from her apartment.

Halbersberg's testimony overlapped some of Barbella's; corroborative testimony is the hallmark of presenting a credible defense. No one would suggest that a second eyewitness to a crime is merely cumulative testimony because of the availability of one eyewitness. The same logic must apply to the presentation of the defense in this case. Halbersberg's testimony crucially went beyond Barbella's proffered testimony and picked up after Barbella had left the apartment. Importantly, Halbersberg saw the defendant come out of the

shower, grab the jeans from the couch, and leave wearing them. Both witnesses were critical to the defense; the synergy of the two made the theory significantly more plausible.

The trial court's in limine ruling "alter[ed] [defendant's] trial strategy," precluding him from presenting -- and the jury from assessing -- a key witness who would have provided both new and corroborative evidence. See ibid. As a result, we find harmful error.

## VII.

The judgment of the Appellate Division affirming the trial court's in limine order is reversed.

CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA and ALBIN join in JUSTICE TIMPONE's opinion. CHIEF JUSTICE RABNER filed a separate, concurring opinion, in which JUSTICES PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join. JUSTICE ALBIN filed a separate, concurring opinion, in which JUSTICE LaVECCHIA joins. JUSTICE PATTERSON filed a separate, partially concurring and partially dissenting opinion, in which JUSTICES FERNANDEZ-VINA and SOLOMON join.

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

        v.

THOMAS L. SCOTT (a/k/a JAMES
LONGENBERGER, and CHRISTOPHER
TUREAUD),

    Defendant-Appellant.


    CHIEF JUSTICE RABNER, concurring.

    In this case, defense counsel sought to call defendant's mother as a witness to exonerate the defendant. The State, in turn, wanted to cross-examine her about two prior occasions when she allegedly falsely tried to exonerate him. As the majority's well-reasoned opinion explains, the current rules of evidence do not allow that inquiry. I write separately to discuss whether the rules should be modified to permit cross-examination about specific instances of conduct that relate to a witness's character for truthfulness.

    Under the existing rules, a witness may not be cross-examined about specific instances of conduct except for two limited areas: prior criminal convictions and prior false criminal accusations. See N.J.R.E. 405, 607, 608.

1

Rule 405 permits character evidence but bars the admission of "[s]pecific instances of conduct not the subject of a conviction of a crime." Rule 608(a) likewise permits evidence "in the form of opinion or reputation" about a "witness's character for truthfulness or untruthfulness." The rule, however, forbids the use of "specific instances of conduct" to prove a trait of character, aside from impeachment based on a criminal conviction under Rule 609. Rule 608(b) provides another narrow exception and allows

> [t]he credibility of a witness in a criminal case [to] be attacked by evidence that the witness made a prior false accusation against any person of a crime similar to the crime with which defendant is charged if the judge preliminarily determines, by a hearing pursuant to Rule 104(a), that the witness knowingly made the prior false accusation.

Finally, Rule 607 notes that the examination of a witness's credibility is subject to the restrictions in Rules 405 and 608.

As a result, in most instances, a witness with a record of demonstrable lies that bear on credibility cannot be asked about them on cross-examination. She is instead allowed to appear before the jury under an artificial light.

I.

It is important to consider the context and purpose underlying today's rules. In State v. Guenther, 181 N.J. 129, 141-42 (2004), this Court traced the history of Rule 608 to the

2

common law and noted certain reasons for the rule: "to prevent unfairness to the witness," "to avoid confusion of the issues before the jury," and to avoid "undue consumption of time." (citing 3A Wigmore on Evidence § 979, at 823, 827 (Chadbourn rev. 1970)).

Guenther described the reasons against using extrinsic evidence to prove specific acts of misconduct. The common law recognized that each additional witness would extend the trial, could "overwhelm the material issues of the case" with testimony on minor points, and could "confuse the tribunal in its effort[]" to focus on material points. 3A Wigmore on Evidence § 979, at 826. In addition, it would be unfair to allow others to refute the testimony of a witness, for whom "it would be practically impossible" to call competent witnesses to dispute the allegation. Ibid.

To be sure, though, the reasons against allowing extrinsic evidence to challenge a witness's testimony had little to do with relevancy. Id. at 827. "The reasons are solely of auxiliary policy," Professor Wigmore noted, and "[w]hen these reasons . . . cease, the rule ceases." Ibid. He offered two such examples: "proof of a particular crime by record of conviction, and proof of particular instances of misconduct in general, by cross-examination of the witness himself." Id. at 827-28 (emphases altered).

N.J.R.E. 608, however, bars not only the use of extrinsic evidence but also cross-examination into specific instances of misconduct. The common law offers no support for the latter principle. To the contrary, as Professor Wigmore explained, the reasons underlying the bar against extrinsic evidence

> appear plainly to have no effect in forbidding the extraction of the facts of misconduct from the witness himself upon cross-examination. (a) There is no danger of confusion of issues, because the matter stops with question and answer; (b) There is no danger of unfair surprise, because the impeached witness is not obliged to be ready with other witnesses to answer the extrinsic testimony of the opponent, for there is none to be answered, and because, so far as the witness himself is concerned, he may not unfairly be expected to be ready to know and to answer as to his own deeds.
>
> [Id. § 981, at 838.]

Professor McCormick likewise noted that the English common law tradition "permit[ted] counsel to broadly inquire about the witness's associations and personal history including any misconduct tending to discredit his character, even though it has not been the subject of a conviction. In the common law tradition the English courts trusted the bar's disciplined discretion to avoid abuse." 1 McCormick on Evidence § 41, at 246-47 (Broun ed., 7th ed. 2013).

For centuries, thus, authorities have recognized a clear distinction between (1) using extrinsic evidence to discredit a

4

witness -- namely, calling additional witnesses to impeach the witness -- which can be unfair and invite confusion and delay, and (2) asking the witness questions on cross-examination that relate to the person's character for truthfulness.  The former was barred for good reason.  Courts historically allowed the latter approach.

II.

Most modern courts follow the common law tradition and permit questioning about specific instances of conduct that are probative of a witness's character for truthfulness.  In federal court, that type of cross-examination is expressly allowed and occurs regularly.  Like New Jersey's rule, Federal Rule of Evidence 608(a) permits reputation or opinion evidence to challenge a witness's character for truthfulness or untruthfulness.  Rule 608(b) addresses the use of specific instances of conduct:

> Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of:  (1) the witness; or (2) another witness whose character the witness being cross-examined has testified about.
>
> [Fed. R. Evid. 608(b) (emphasis added).]

5

A majority of states follow the federal approach and permit cross-examination into specific instances of conduct if they are probative of the witness's character for truthfulness. Eight states follow the federal rule verbatim: Arizona, Ariz. R. Evid. 608(b); Iowa, Iowa R. Evid. 5.608(b); Mississippi, Miss. R. Evid. 608(b); New Mexico, N.M. R. Evid. 11-608(B); North Dakota, N.D. R. Evid. 608(b); South Dakota, S.D. Codified Laws § 19-19-608(b); Utah, Utah R. Evid. 608(b); and West Virginia, W. Va. R. Evid. 608(b). Maine uses nearly identical language. Me. R. Evid. 608(b). Connecticut also follows the federal approach. Conn. Code Evid. 6-6(b).

Many states adopted the version of Rule 608 in the Uniform Rules of Evidence, which tracks the essence of the federal rule with slightly different language:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. However, in the discretion of the court, if probative of truthfulness or untruthfulness, they may be inquired into on cross-examination of the witness (i) concerning the witness's character for truthfulness or untruthfulness, or (ii) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.
>
> [Unif. R. Evid. § 608(b) (Nat'l Conf. of Comm'rs on Unif. State Laws 2005).]

Twenty states use either that precise text or substantially similar language:  Arkansas, Ark. R. Evid. 608(b); Colorado, Colo. R. Evid. 608(b); Delaware, Del. R. Evid. 608(b); Georgia, Ga. Code Ann. § 24-6-608(b); Idaho, Idaho R. Evid. 608(b); Kentucky, Ky. R. Evid. 608(b); Michigan, Mich. R. Evid. 608(b); Montana, Mont. Code Ann. § 26-10-608(b); Neb. Rev. Stat. § 27-608(2); Nevada, Nev. Rev. Stat. § 50.085(3); New Hampshire, N.H. R. Evid. 608(b); North Carolina, N.C. Gen. Stat. § 8C-1, Rule 608(b); Ohio, Ohio R. Evid. 608(B); Oklahoma, Okla. Stat. tit. 12, § 2608(B); Rhode Island, R.I. R. Evid. 608(b); South Carolina, S.C. R. Evid. 608(b); Vermont, Vt. R. Evid. 608(b); Washington, Wash. R. Evid. 608(b); Wisconsin, Wis. Stat. § 906.08(2); and Wyoming, Wyo. R. Evid. 608(b).

Minnesota and Tennessee use the language of Unif. R. Evid. 608(b) and add procedural protections.  See Minn. R. Evid. 608(b), (c); Tenn. R. Evid. 608(b).  Maryland also allows cross-examination about a witness's prior conduct that is probative of untruthfulness, when the questioner, if challenged, "establishes a reasonable factual basis" outside the jury's presence.  Md. R. 5-608(b).

Hawaii permits cross-examination about specific instances of a witness's conduct, if probative of untruthfulness, and affords judges discretion to allow the use of extrinsic evidence.  Haw. Rev. Stat. § 626-608(b).

7

Kansas allows any party to "introduce extrinsic evidence concerning any conduct by [the witness] and any other matter relevant upon the issues of credibility." Kan. Stat. Ann. § 60-420.

California permits evidence of specific instances of conduct to challenge a witness's credibility in criminal but not civil cases. See Cal. Const. art. I, § 28; Cal. Evid. Code § 787; People v. Harris, 767 P.2d 619, 640-41 (Cal. 1989).

Six states adopted only the latter part of Federal Rule of Evidence 608(b). They permit cross-examination of a character witness with specific instances of conduct about the character for truthfulness or untruthfulness of the underlying witness. See Ala. R. Evid. 608(b); Alaska R. Evid. 608(b); Ind. R. Evid. 608(b); La. Code Evid. art. 608(B); Pa. R. Evid. 608(b); Va. Sup. Ct. R. 2:608. Except to prove a criminal conviction, extrinsic evidence may not be used, and the states do not allow inquiry into specific instances of conduct of the testifying witness himself.

Only a few states reject the federal approach entirely and do not permit evidence of specific acts of conduct to attack or support a witness's credibility. See Mass. Guide Evid. 608(b); Or. Rev. Stat. § 40.350(2); Tex. R. Evid. 608(b).

New Jersey has followed the minority rule for quite some time. N.J.R.E. 608 was adopted in 1992. It incorporated the

8

same limitation against the use of specific instances of conduct that appeared in the prior Rule 22(d).  Supreme Court Committee Comment on N.J.R.E. 608 (1991), reprinted in Biunno, Weissbard, & Zegas, New Jersey Rules of Evidence (Biunno) 612 (2016).  The Supreme Court adopted Rule 22 in 1967.  Supreme Court Adopts Evidence Rules, 90 N.J.L.J. 393 (June 15, 1967).  The rule followed settled New Jersey law.  See, e.g., State v. De Paola, 5 N.J. 1, 9-11 (1950).

When New Jersey restyled its rules of evidence in 1992 to follow the format of the federal rules, no substantive change was made in this area.  In general, as the Committee on Evidence observed, "[t]he overall effect" of the changes was "neither startling nor radical and [did] not substantially alter prevailing practice."  Report of the Supreme Court Committee on the Rules of Evidence (1991), reprinted in Biunno, supra, at x.  As to Rule 608, there is no record of the reason the minority rule was maintained, other than the following brief statement:  "[The] rule is consistent in philosophy and effect with the choice made in respect of Rule 405(a), namely adopting the state rather than the federal analogue.  It is the Committee's view that Rule 607 affords sufficient scope for the effective impeachment of credibility."  Supreme Court Committee Comment on N.J.R.E. 608 (1991), reprinted in Biunno, supra, at 612.

III.

The differences under the two primary approaches matter a great deal. Under the majority rule, a witness can be questioned about specific conduct that generally involves dishonesty or false statements; in New Jersey, witnesses are shielded from that type of inquiry. For example, in federal court and in most states, a witness can be asked if he or she previously lied under oath, see United States v. Whitmore, 359 F.3d 609, 619-20 (D.C. Cir. 2004), used false social security numbers, see United States v. Weekes, 611 F.3d 68, 71 (1st Cir. 2010), cert. denied, 546 U.S. 1021, 131 S. Ct. 3021, 180 L. Ed. 2d 850 (2011), made a false statement about marital status to get a marriage license, see United States v. Beros, 833 F.2d 455, 463 (3d Cir. 1987), criticized on other grounds, Schad v. Arizona, 501 U.S. 624, 634 n.5, 111 S. Ct. 2491, 2498 n.5, 115 L. Ed. 2d 555, 567 n.5 (1991), or altered time records and inflated bills to clients, see United States v. Simonelli, 237 F.3d 19, 22-23 (1st Cir.), cert. denied, 534 U.S. 821, 122 S. Ct. 54, 151 L. Ed. 2d 23 (2001). Focused cross-examination into that type of conduct relates to the witness's veracity and credibility, and is considered neither unfair nor confusing.

In New Jersey, by contrast, a witness who previously lied under oath can testify again without facing any questions about the matter -- absent two exceptions -- even though the

10

information is plainly pertinent to the jury's ability to evaluate the witness's credibility. The current rules prevent jurors from hearing anything about a prior specific instance of conduct that bears directly on credibility, aside from the minor exceptions noted above.

This appeal highlights problems posed by the current law. A witness's prior dishonest acts and false statements, which relate to the person's character for truthfulness, cannot be probed for the jury, with rare exception. If a witness has falsely accused someone of a crime, though, the witness may be cross-examined on that topic in certain situations. See N.J.R.E. 608(b). That limited exception makes eminently good sense and serves one of the core principles of the justice system: to seek the truth by confronting and possibly exposing a witness who may lack credibility. However, if another witness has falsely tried to exonerate a person, the witness cannot be questioned on that specific instance of conduct.

False testimony to exonerate is just as troublesome as a false criminal accusation. Both impede the search for the truth. Indeed, it is hard to explain to the public why one area can be probed and not the other.

In both instances, Rule 403 would bar testimony that would confuse the issues, distract the jury with an extended sideshow, or cause undue prejudice. Trial judges ably guard against those

11

concerns now when they decide whether to allow cross-examination about prior false accusations.  Just the same, I trust the discretion of trial judges to limit carefully cross-examination about prior false efforts to exonerate and other specific instances of conduct that relate to credibility.

Had the federal or uniform rule applied in this case, we do not know from the record whether the State would have been allowed to ask defendant's mother whether she lied twice before to protect her son.  The State would need a good faith basis for that line of questioning and would have to satisfy any concerns under Rule 403.  The trial judge, in turn, would have been required to limit the testimony in order not to reveal any prior criminal activity that would unduly prejudice defendant.

That said, if there is a legitimate basis for the question, what is wrong with asking a witness whether she had lied before to protect her son about a serious matter?  Why should the rules prevent a jury from hearing that question and answer, and having a chance to evaluate the witness's demeanor?  The question alone is not evidence, but the answer -- even a denial -- can convey pertinent information to a jury.

In most jurisdictions, the inquiry would end at that point. Counsel is bound by the witness's answer and cannot offer extrinsic evidence.  In other words, counsel cannot call another witness to disprove the answer and show that the specific

incident occurred.  Jack B. Weinstein & Margaret A. Berger,

Weinstein's Federal Evidence § 608.22 (Matthew Bender 2017).

That guards against delay and confusion.

It is hardly unfair to ask a witness about his or her own

behavior.  But it does seem unfair to keep factfinders in the

dark about discrete instances of conduct that relate to a

witness's character for truthfulness.  The justice system's

focus belongs on enabling juries to decide whether a witness can

be believed, not on how attorneys may prepare for cross-

examination.  Asking witnesses to respond directly to pertinent

questions serves that aim.  Character evidence from a third

party, by comparison, is a weak substitute to assess the

witness's own response.

I believe it is time to consider whether Rule 608 should be

revised to allow cross-examination, in a controlled fashion,

into specific instances of conduct that are probative of the

witness's character for truthfulness.  Without question, that

would amount to a substantial change in practice.  But the

Judiciary has not shied away from reassessing its approach when

there is cause to do so.  See, e.g., State v. Witt, 223 N.J. 409

(2015).

Thoughtful judges, practitioners, and academics can

evaluate the current state of the law and consider appropriate

safeguards that might accompany a change.  Aside from changes to

Rule 608 in 2007 to incorporate Guenther, see R. 608(b); Biunno, supra, comment 2 on N.J.R.E. 608, at 614, it is unclear when the Committee on Evidence last examined the rule in depth.  At the very least, it has been decades.

I recommend that the Committee consider the question again today for a simple reason:  the topic relates directly to the jury's search for the truth, which a system of justice should foster.

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

       v.

THOMAS L. SCOTT (a/k/a JAMES
LONGENBERGER, and CHRISTOPHER
TUREAUD),

    Defendant-Appellant.

    JUSTICE ALBIN, concurring.

    I fully concur with Justice Timpone's thoughtful and well-reasoned opinion.  I write separately to address the proposal in the Chief Justice's concurring opinion that we should align N.J.R.E. 608 with its federal counterpart.

    N.J.R.E. 608 generally prohibits collateral attacks on a witness's character for truthfulness through specific-conduct impeachment evidence.  Our codified rules of evidence -- in line with the historic development of New Jersey's common law -- forbid such collateral impeachment attacks for reasons of fairness and public policy.  Under our evidence rules, a sexual assault victim cannot be asked whether she misrepresented her assets on a student loan application; a police officer cannot be asked whether he lied about his age on a summer employment application years earlier or plagiarized a paragraph in

1

completing a college essay; and a defendant, on trial for aggravated assault, cannot be asked whether he misstated his income on his tax returns. That form of impeachment attack is not permitted because the probative value of such questioning is outweighed by the potential prejudice of diverting jurors from the central issues in a case -- and because we do not assume that a person who lied in the past under wholly different circumstances will lie under oath at trial.

The Chief Justice's proposal, if adopted, would allow the use of specific instances of untruthfulness -- wholly unrelated to the litigation -- to impeach a witness's character for veracity. The threat of such collateral attacks could keep crime victims from coming forward and injury victims from bringing their claims. Such a threat might also keep defendants off the stand, thus depriving the jury of their testimony. It would also encourage parties to forage for impeachment evidence to launch wide-ranging attacks on a witness's credibility.

That is why our present evidence rule N.J.R.E. 608, its predecessor evidence rule, and New Jersey's common law never incorporated the Chief Justice's proposal to allow specific instances of conduct as a means of impeaching a witness's character for truthfulness. In 1991, our Supreme Court Evidence Rule Committee -- in making recommendations to amend our then-evidence rules -- surveyed the federal evidence rules and

2

specifically considered and rejected reshaping N.J.R.E. 608 to conform to federal practice.

To be sure, our current rules do not allow an incorrigibly dishonest witness a safe haven. Our rules permit the impeachment of a witness's credibility by such means as opinion and reputation evidence, bias, prior inconsistent statements, false statements made in the matter, and prior false accusations.

The parties have not asked this Court to amend N.J.R.E. 608, nor have there been complaints from the bar about the rule. Although our rules limiting impeachment may not be perfect, they sensibly accommodate two important goals: the search for truth and the need for fairness in our criminal and civil justice system. Before tearing down our present structure, thought must be given to whether the replacement would be better.

I do not see any special justification for altering the current formulation of N.J.R.E. 608, for reasons I will now more fully explain.

I.

A.

Our rules of evidence generally prohibit impeachment of a witness's character for truthfulness through the use of specific instances of conduct. N.J.R.E. 608(a) ("Except as otherwise provided by Rule 609 and by paragraph (b) of this rule, a trait

3

of character cannot be proved by specific instances of conduct."); see also N.J.R.E. 405(a) ("Specific instances of conduct not the subject of a conviction of a crime shall be inadmissible [to prove a trait of character]."). There are a few exceptions to this general rule. For example, a witness's credibility can be impeached with prior criminal convictions, N.J.R.E. 609, or prior false accusations, N.J.R.E. 608(b), and specific instances of conduct are admissible when a party's character for truthfulness is an essential element of a claim or defense, N.J.R.E. 405(b), such as in a defamation case. Otherwise, an attack on a witness's character for truthfulness must come in the form of reputation or opinion evidence. N.J.R.E. 405(a).

In contrast to the New Jersey approach, the federal rules of evidence permit the use of "specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." Fed. R. Evid. 608(b).[1] The federal rule,

---

[1] Federal Rule of Evidence 608(b), in full, provides:

> Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of:

4

however, bars the introduction of extrinsic evidence to prove the specific instance of conduct. Thus, the examiner cannot go further than posing the question and accepting the answer. For instance, the examiner may ask a witness, who is a cheating husband, whether he lied to his wife innumerable times about his faithfulness. However, on receiving a negative response, the examiner cannot not rebut the answer with extrinsic evidence.

I disagree with the Chief Justice's view that "even a denial . . . can convey pertinent information to a jury" in the absence of rebuttal evidence. Ante at ___ (Rabner, C.J., concurring) (slip op. at 12). Can the denial, in the example above, suggest the opposite -- the husband lied to his wife? To allow an adverse inference to be drawn from the denial would mean that the question itself would be transformed into affirmative evidence. Permitting this level of speculation on a collateral issue, one so tangential to the case at hand, would surely divert the jurors' eyes from the true issues.

The only limitation on the expansive use of specific instances of conduct to impair a witness's character for truthfulness is Federal Rule of Evidence 403, which weighs the

---

(1) the witness; or

(2) another witness whose character the witness being cross-examined has testified about.

5

probative value of the inquiry against its potential prejudicial effect.[2]  Of course, different judges, even in similar cases, may come to different outcomes in weighing the competing Rule 403 factors, and those outcomes, if within the realm of reason, would have to be respected under an abuse-of-discretion standard.

B.

The New Jersey approach is not the product of mistake or oversight.  This Court thoroughly highlighted the historical and practical basis for this State's commitment to N.J.R.E. 608's limited scope in State v. Guenther, 181 N.J. 129, 139-44, 151-54 (2004).  The Guenther Court explained that we bar "the use of prior instances of conduct to attack the credibility of a witness for two essential reasons:  to prevent unfairness to the witness and to avoid confusion of the issues before the jury." Id. at 141.  Under our current rule, we have concluded that it would not be fair that a witness must answer for his whole life and respond to long ago instances of untruthful conduct.  Ibid.; see also The New Wigmore:  A Treatise on Evidence:  Impeachment and Rehabilitation § 3.3 (2017).  We also have determined that

---

[2] Federal Rule of Evidence 403 provides:  "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

"wide-ranging collateral attacks on the general credibility of a witness" may lead to jury confusion and distract the jury from "the true issues in the case." Guenther, supra, 181 N.J. at 141-42; see also The New Wigmore, supra, § 3.3. Concerns about witness fairness and jury confusion are not diminished merely because extrinsic evidence cannot be introduced to impeach the witness.

Allowing expansive collateral attacks on a witness's credibility through prior specific conduct would likely have the unintended consequence of prompting attorneys to forage through a witness's past, "hoping to snare some morsel of information" that can be used for impeachment purposes. See State v. Hernandez, 225 N.J. 451, 466 (2016). Attorneys will investigate witnesses to determine whether they have made misrepresentations on job and license applications; mortgage, loan, and tax statements; and academic and professional articles, to name but a few examples. Specific instances of conduct will be admissible even though wholly collateral to the case itself.

Under the federal evidence rules, an aggravated-assault victim or a personal-injury plaintiff can be asked on cross-examination whether she misrepresented her income on a job application or a tax return seven years ago. Such prior acts of dishonesty would bear little relevance to the victim's or plaintiff's credibility in court but likely would have an

7

outsized effect on the jury's evaluation of that witness.  The admission of the singular incident, or incidents, of untruthfulness would allow the jury to engage in the most simplistic and dangerous assumption -- once a liar, always a liar.  See Richard E. Redding, Socialization by the Legal System:  The Scientific Validity of a Lacanian Socio-Legal Psychoanalysis, 75 Or. L. Rev. 781, 799-800 (1996).  That a witness previously misrepresented his income or work history on an employment application would hardly signify that the witness is primed to give perjured testimony in court.  See id. at 800.  That a witness at a younger age and under different circumstances was untruthful is not a basis for a presumption that dishonesty is a fixed personality trait of the witness.  Id. at 800-01.  Allowing juror speculation on such a subject will not advance the truth-seeking purpose of a trial.

One learned treatise on the subject of evidence has concluded that New Jersey's prohibition against specific-conduct evidence on cross-examination "is arguably the fairest and most expedient" compared to other formulations of Rule 608.  See 1 McCormick on Evidence § 41, at 180 (Broun ed., 6th ed. 2006).  The restriction on the use of specific-conduct evidence is preferable because of "the dangers of prejudice (particularly if the witness is a party), of distraction and confusion, of abuse by asking unfounded questions, and of the difficulties . . . of

determining whether particular acts relate to character for truthfulness." Ibid. McCormick, therefore, suggests that our current N.J.R.E. 608 is the superior approach.

## II.

Significantly, the parties have not complained about the current structure of N.J.R.E. 608, nor am I aware of critiques of N.J.R.E. 608 coming from members of the bar or academia. The present version of N.J.R.E. 608 -- although different from its federal counterpart -- is "consistent with our own jurisprudence and values." See Guenther, supra, 181 N.J. at 155; see also Biunno, Current N.J. Rules of Evidence, comment 1 on N.J.R.E. 608 (2016) (noting that N.J.R.E. 608 reflects long-established New Jersey law). In many areas of the law, in construing our State Constitution and adopting evidence and discovery rules, this Court has charted a different path than the one followed by the federal courts and many other courts. See Guenther, supra, 181 N.J. at 151-54. We have not hesitated to follow "a distinct minority view" when doing so is consistent with our "unique interests, values, [and] customs."[3] See Lewis v. Harris, 188 N.J. 415, 456 (2006).

---

[3] New Jersey stands with Illinois, Massachusetts, Oregon, and Texas in barring evidence of specific instances of conduct to impeach a witness's character for truthfulness or untruthfulness. See Ill. R. Evid. 608; Or. Rev. Stat. § 40.350(2); Tex. R. Evid. 608(b); Massachusetts Guide to Evidence § 608(b) (2017).

Our Evidence Rules Committee has not proceeded in blissful ignorance of the distinction between the New Jersey and federal approaches.  More than two decades ago, the Committee reviewed the rules of evidence and recommended certain revisions to this Court.  See Report of the Supreme Court Committee on the Rules of Evidence, 129 N.J.L.J. 1 (Oct. 10, 1991).  At the time, the Committee recognized that N.J.R.E. 608 does not align with federal practice.  See id. at 25.  The Committee believed that New Jersey's evidence rules already "afford[] sufficient scope for the effective impeachment of credibility."  Ibid.  In preserving N.J.R.E. 608's current formulation, the Committee recommended "retain[ing] present New Jersey practice by rejecting the . . . federal rule which permits limited admissibility of specific instances of conduct on cross-examination."  Ibid.  The Committee observed that this rejection of the federal rule preserved the prohibition on specific-conduct evidence contained in the first formal codification of the 1967 New Jersey Rules of Evidence.  Ibid.

N.J.R.E. 608's predecessor, N.J.R.E. 22(d), provided, "evidence of specific instances of his conduct, relevant only as tending to prove a trait of his character, shall be inadmissible."  N.J.R.E. 22(d) (effective 1967).  Rule 22(d), when prepared, was "representative of current New Jersey [common] law."  Report of the New Jersey Supreme Court Committee

10

on Evidence 71 (Mar. 1963) (citing State v. De Paola, 5 N.J. 1 (1950)).  Accordingly, N.J.R.E. 608 is "consistent in philosophy and effect" with our long-standing evidence rules.  See Report of the Supreme Court Committee on the Rules of Evidence, supra, 129 N.J.L.J. at 25.

Recently, this Court reaffirmed the wisdom of this approach.  In Hernandez, supra, the defendants made extensive discovery demands from the State for files relating to investigations and prosecutions in which a cooperating witness had participated, claiming their entitlement to discovery of "false and inconsistent statements made by the Witness in the unrelated investigations."  225 N.J. at 453, 466.  We made clear that "such statements would not be admissible under N.J.R.E. 608 because 'evidence of specific instances of conduct -- other than a prior conviction -- to prove the character trait of untruthfulness is prohibited.'"  Id. at 466-67 (quoting Guenther, supra, 181 N.J. at 140).  We therefore rejected the defendants' discovery request.  Id. at 466.

Typically, we look for a special justification before we alter a long-standing precedent or rule.  See, e.g., State v. Witt, 223 N.J. 409, 414-15 (2015).  We have not received complaints about the operation of N.J.R.E. 608 from members of the judiciary, the bar, or the public.  Nothing has changed in the twenty-five years since our Evidence Rules Committee last

11

rejected the federal formulation of <u>Rule</u> 608.

### III.

Because I see no sound justification for abandoning this State's common-law rule codified in <u>N.J.R.E.</u> 608 in favor of the federal rule, I would retain our current rule.

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

       v.

THOMAS L. SCOTT (a/k/a JAMES
LONGENBERGER, and CHRISTOPHER
TUREAUD),

    Defendant-Appellant.

    JUSTICE PATTERSON, concurring in part and dissenting in part.

    I concur with the majority's holding that evidence of prior instances in which defendant Thomas Scott's mother, Darlene Barbella, lied to law enforcement officers to protect her son was not probative of bias, or admissible under N.J.R.E. 608 or N.J.R.E. 404(b). Ante at ___ (slip op. at 15-16). Accordingly, I agree with the majority that the trial court's ruling in limine, authorizing the State to cross-examine Barbella on her prior misstatements to law enforcement, constituted error.

    I part company with the majority, however, with respect to the question of harmless error. Rule 2:10-2 directs that we disregard error "unless it is of such a nature as to have been clearly capable of producing an unjust result." That standard requires "some degree of possibility that [the error] led to an

1

unjust result.  The possibility must be real, one sufficient to raise a reasonable doubt as to whether [the error] led the jury to a verdict it otherwise might not have reached."  State v. Lazo, 209 N.J. 9, 26 (2012) (first alteration in original) (quoting State v. R.B., 183 N.J. 308, 330 (2005)); State v. Ingram, 196 N.J. 23, 49 (2008).  Rule 2:10-2 thus compels us to review the entire record and carefully consider the impact of the error in the context of the evidence as a whole.  See State v. Wilder, 193 N.J. 398, 415 (2008); State v. Kelly, 97 N.J. 178, 218 (1984); State v. Allison, 208 N.J. Super. 9, 18-19 (App. Div.), certif. denied, 102 N.J. 370 (1985).

In my view, the record strongly supports a finding of harmless error in this case.  The trial court did not deprive defendant of the opportunity to present credible testimony explaining the presence of two decks of heroin in the left pocket of his jeans when he was stopped by a police officer.  To the contrary, the trial court's evidentiary ruling affected only one witness, Barbella.  Defendant represents that he did not call Barbella to the stand due to concern that she would be impeached with evidence of her prior acts.

This case presents an unusual setting for a harmless error analysis.  Here, we need not speculate as to what Barbella would have told the jury had defendant called her as a witness. Defendant represents that Barbella would have testified "to the

2

same version of events" that was offered at trial by another defense witness, family friend Lauren Halbersberg. In my view, that "version of events" -- that defendant's mother accidentally planted heroin in her son's jeans without his knowledge -- is nothing short of preposterous. Defendant's theory was, unsurprisingly, rejected by the jury in defendant's trial, and would, in my view, clearly have been rejected with or without the testimony of Barbella.

Halbersberg told the jury that the heroin found in defendant's jeans did not belong to him, but to his cousin, Jordan Scott, an individual whom she characterized as "nothing but a problem." She testified that on November 27, 2012, she was in defendant's home with defendant and his cousin Jordan, in a duplex apartment a floor above the home of defendant's mother. Halbersberg stated that as she sat in a recliner, engrossed in Facebook posting, she observed Jordan sleeping nearby on a couch, making strange noises as he slept. She testified that at the time, defendant was preparing to take a shower.

Halbersberg told the jury that Barbella entered the room twice while she sat in the recliner and Jordan Scott slept on the couch. She testified that on her second visit, Barbella noticed heroin on a "magazine type table" attached to the couch. According to Halbersberg, Barbella was "totally livid" when she discovered the heroin and asked her nephew Jordan, "what the

hell is this[?]" Halbersberg did not testify that Jordan responded to that inquiry.

Halbersberg told the jury, "[b]asically, what [Barbella] did was, she took the two bags [of heroin]. There was a pair of jeans that were over, you know, the couch, folded over the couch. And she put them in the pocket." By Halbersberg's account, Barbella did nothing to verify whether the jeans belonged to Jordan Scott, rather than to defendant -- who had evidently removed his pants in order to take a shower. Instead, according to Halbersberg, Barbella simply put the heroin in the jeans pocket and left the room.

Halbersberg told the jury that defendant then emerged from the shower, "[t]ook the, you know, pants, and his clothes," and put them on in the bathroom. She testified that although she was aware that there was heroin in the pocket of the jeans that defendant had just put on, she did not mention that fact to defendant as they walked out of the house together; she attributed that omission to an undefined "commotion" at the time. Halbersberg stated that defendant was picked up by a friend, and that she returned home later to learn, to her distress, that defendant had been arrested and charged with possession of heroin. Despite her purported concern about defendant's arrest, Halbersberg inexplicably failed to disclose

4

to law enforcement authorities that she had watched Barbella place heroin in the pocket of defendant's jeans.

The narrative offered by Halbersberg -- a narrative that, we are advised, Barbella would have duplicated had she testified -- is simply incredible. According to the testimony, Barbella reacted to the discovery of heroin in her home not by contacting the police or disposing of the heroin, but by placing it in the pocket of a pair of jeans that she found in the room. Barbella purportedly took that step without verifying whether the jeans belonged to her nephew or her son, who had removed his clothing to take a shower, or warning anyone that drugs were present. Halbersberg testified that she similarly said nothing to defendant about what his mother had done -- an astonishing omission, given Halbersberg's admitted awareness that when defendant left the apartment to go out with a friend, he was wearing those very jeans.[1] Having heard the testimony and argument supporting the theory that the heroin was accidentally

---

[1]  The majority suggests that Barbella would have testified that after she found the heroin and placed it in the jeans, she ordered Jordan Scott to leave her home, possibly anticipating that he would take the heroin with him. Ante at ___ (slip op. at 19). If so, her testimony would have diverged from that of Halbersberg, who said nothing about any demand by Barbella that Jordan Scott leave the home. Instead, Halbersberg testified that as she and defendant departed, Jordan was "making noises or whatever."

planted in defendant's jeans, not a single juror found reasonable doubt of defendant's guilt.

The majority concludes that "[t]he trial court's ruling 'alter[ed] [defendant's] trial strategy,' precluding him from presenting -- and the jury from assessing -- a key witness who would have provided both new and corroborative evidence." Ante at ___ (slip op. at 20) (second and third alterations in original) (quoting State v. P.S., 202 N.J. 232, 260 (2010)). The majority's contention that the trial court's ruling changed defendant's trial strategy is belied by the record. As defendant confirmed before this Court, with or without Barbella, his trial strategy was the same: to contend that his mother put two decks of heroin in his pocket without his knowledge and that, consequently, he did not knowingly possess the drugs.[2] Thus, Barbella's testimony would not have afforded defendant a trial strategy that was unavailable to him in her absence.[3] The strategy was employed -- and it failed.

---

[2] The fact that Barbella's testimony would have duplicated Halbersberg's testimony strongly suggests that the error in this case was harmless. See State v. Marshall, 148 N.J. 89, 188, cert. denied, 522 U.S. 850, 118 S. Ct. 140, 139 L. Ed. 2d 88 (1997) (finding no clear error in the setting of a post-conviction relief application for precluded testimony that "would have merely duplicated other testimony, and it would have been contradicted by other evidence that the trial court found to be credible").

[3] This case is vastly different from the two cases on which the majority premises its harmless error holding, P.S., supra, 202

The majority further contends that Halbersberg's testimony would have been corroborated and made more plausible by the testimony of defendant's mother, Barbella. I respectfully disagree. Barbella's appearance at trial would have enabled the State to further undermine defendant's claim that he unwittingly carried heroin on his person because of his mother's disastrous mistake. The prosecutor would undoubtedly have cross-examined Barbella on her inexplicable conduct following the discovery of heroin in her home: her apparent assumption that the jeans were not defendant's notwithstanding the fact that defendant had undressed to take a shower moments before, her decision to place heroin in jeans that she believed were the property of her unconscious nephew, and her failure to tell anyone what she had done. In my view, Barbella's testimony would have undermined an already farfetched theory, and her testimony would have done the defense more harm than good.

---

N.J. at 260, and Kelly, supra, 97 N.J. at 202-03. In P.S., supra, the Court held that the trial court's admission of a previous sexual assault allegation against the defendant was not harmless error because it precluded the defendant from presenting his critical defense that the child victim had accused him of sexual assault because she had a vendetta against him. 202 N.J. at 260. In Kelly, supra, the trial court barred the defendant from presenting her expert on her defense of battered women's syndrome, thus precluding her from presenting a self-defense justification to the charge that she murdered her husband. 97 N.J. at 88, 202. In contrast, in this case defendant had the opportunity to present his defense theory, notwithstanding the trial court's evidentiary ruling.

7

In short, although I concur with the majority's determination of the evidentiary issue presented by this case, I do not consider the trial court's evidentiary error to be "clearly capable of producing an unjust result." R. 2:10-2. I view the trial court's ruling to be harmless error. I therefore respectfully dissent from the majority's judgment reversing defendant's conviction.

Finally, I agree with the view expressed by Chief Justice Rabner in his concurring opinion that a revision to N.J.R.E. 608, authorizing limited cross-examination regarding specific conduct by a witness if that conduct is probative of the witness' character for truthfulness, should be considered. Accordingly, I join in the Chief Justice's concurring opinion.